669 So.2d 56 (1996)
The AETNA CASUALTY AND SURETY COMPANY, City Insurance, Inc., and Burt Young
v.
Mrs. Cherry BERRY, Administratrix of the Estate of H.H. "Jack" Berry, Deceased, and Mrs. Cherry Berry, Individually.
No. 91-CA-00107-SCT.
Supreme Court of Mississippi.
February 15, 1996.
*58 Guy T. Gillespie, III, Janet G. Arnold, Robert S. Mink, Holcomb Dunbar Connell Chaffin & Willard, Oxford, Cary E. Bufkin, Jim Bullock, Shell Buford Bufkin Callicutt & Perry, Jackson, John C. McLaurin, McLaurin & McLaurin, Brandon, Whitman B. Johnson, III, Michael F. Myers, Currie Johnson Griffin Gaines & Myers, Jackson, Jimmie B. Reynolds, Steen Reynolds & Dalehite, Jackson, for appellants.
Roland C. Lewis, Jackson, Patricia R. Alexander, Law Office of Roland C. Lewis, Jackson, Lawrence J. Franck, J. Collins Wohner, Jr., Donna Brown Jacobs, Butler Snow O'Mara Stevens & Cannada, Jackson, Fred M. Harrell, Jr., Harrell & Rester, Brandon, for appellees.
En Banc.

ON PETITION FOR REHEARING
SULLIVAN, Presiding Justice, for the Court:
The original opinions are withdrawn and these opinions are substituted therefor.
This lawsuit stems from an automobile accident in which H.H. "Jack" Berry (Mr. Berry) was killed on November 14, 1981, while riding as a passenger in a vehicle operated by his wife, Cherry Berry (Ms. Berry). The vehicle driven by Ms. Berry was a Pontiac Bonneville station wagon owned by General Motors Corporation (GM), and loaned to the Berrys by a GM district representative. The Berrys collided head-on with a 1971 Ford LTD driven by Willie B. Davis (Davis), an uninsured drunk driver. Davis later entered a plea of guilty to manslaughter and was sentenced to fifteen years incarceration.
Ms. Berry initially brought three lawsuits in the United States District Court For The Southern District Of Mississippi, on November 30, 1981, sixteen days after the accident. The federal court consolidated the three suits by Order of Consolidation on November 3, 1983. In the complaint filed in the district court, Ms. Berry named the following defendants: (1) Aetna Casualty And Surety Company (Aetna)  the insurance company that issued the garage liability policy to Mr. Berry's car dealership, Berry Pontiac-G.M.C. (Berry Pontiac); (2) Royal Globe Insurance Company of America (Royal Globe)  the company that issued the insurance policy on the borrowed vehicle in which Mr. Berry was killed; and, (3) Motors Insurance Corporation. Ms. Berry demanded judgment in the *59 sum of $100,000.00 compensatory damages and $10,000,000.00 punitive damages against the defendants jointly and severally. Motors Insurance Corporation was voluntarily dismissed on January 7, 1982.
Ms. Berry then filed a Motion For Leave to File Amended Complaint in the district court alleging "additional grounds, including bad faith," on the part of Aetna and Royal Globe. In her district court motion for summary judgment, Ms. Berry stated that Aetna was guilty of the intentional tort of bad faith because it wrongfully denied her UM coverage under the policy issued to Berry Pontiac, Mr. Berry's car dealership.
The district court determined that Royal Globe's maximum liability was $20,000.00 in UM coverage. On April 4, 1985, District Judge Tom S. Lee issued a memorandum opinion finding that Mr. Berry was not covered as a first class insured because Berry Pontiac, not Mr. Berry, was the named insured under the Aetna policy. Further, Judge Lee found that Mr. Berry was not a second class insured under the Aetna corporate policy issued to Berry Pontiac because UM coverage under the policy only applied to owned automobiles, and at the time of the accident Mr. Berry was traveling in a vehicle owned by GM, not Berry Pontiac.
Judge Lee further found that the drive other car (DOC) endorsement attached to the Aetna policy, which provided individual liability insurance and medical coverage for Mr. Berry on cars not owned by Berry Pontiac, did not provide UM benefits because there was not a premium charged for UM coverage on the endorsement. However, because there was no written waiver of UM coverage, Judge Lee found that Aetna was liable for UM coverage in the minimum statutory amount of $10,000.00. Berry v. Aetna Cas. and Sur. Co., 607 F. Supp. 397 (D.C.Miss. 1985). The court entered judgment in favor of Ms. Berry and against Aetna for the statutory minimum amount of $10,000.00 on July 29, 1985.
Ms. Berry unsuccessfully appealed Judge Lee's decision to the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court. Berry v. Aetna Casualty and Surety Co., 787 F.2d 586 (5th Cir.1986), cert. denied, 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 291 (1986). She then filed a complaint on November 12, 1987, nearly six years after the accident, in the Rankin County Chancery Court. The chancery court suit was styled "Complaint for Accounting of Monies Collected by Insurance Agent and Insurance Company, Specific Performance of Contract, Bill of Discovery, and Other Relief." The new complaint named as defendants Aetna, Bill Dumbauld and Keith Bayless as Aetna representatives, City Insurance Inc. (City), Burt Young (Young) in his individual capacity as the insurance agent who sold the Aetna policy to Berry Pontiac, Jackson Excavating and Leasing Company, Inc. (owner of a 1978 Dodge pick-up also involved in the accident), Walter J. Evans, Jr. (driver of the pick-up), and Willie B. Davis, the uninsured driver who negligently caused the accident.
The complaint filed in the chancery court stated that "[a]s a proximate consequence of conspiracies, conversions, frauds, negligence, breach of implied warranty of merchantability, breach of implied warranty of fitness, breach of express warranties, and under the doctrine of strict liability, Aetna, Dumbauld, Bayless, City and Young, as manufacturers of the defective insurance policy and because of their bad faith," are liable for $10,000,000.00 actual damages and $10,000,000.00 punitive damages, and attorney's fees and all costs of the cause. Furthermore, alleging that Jackson Excavating, Walter Evans, and Davis were all negligent in causing the collision that resulted in Mr. Berry's death, Ms. Berry demanded $3,000,000.00 and $5,000,000.00 punitive damages, attorney's fees and all costs of the cause as to those defendants. The court, with consent of plaintiff, dismissed defendants Bill Dumbauld (Aetna's claims supervisor) and Keith Bayless (Aetna's underwriting supervisor) without prejudice.
Ms. Berry's complaint also alleged that she suffered the following damages as a result of the defendants' bad faith:
1. Mr. Berry's conscious pain and suffering.
2. The economic value of Mr. Berry's life... .

*60 3. Mrs. Berry's conscious pain and suffering and disability, both physical and psychological.
4. Past medical bills not exceeding $20,000.00.
5. Lost wages to-date not exceeding $25,000.00.
6. Future medical bills of a minimum of $50,000.00.
7. Lost wages to-date in a sum not exceeding $50,000.00.
8. Psychological trauma for Mrs. Berry's injuries resulting from Mr. Berry's suffering fatal injury in her presence.
9. Punitive damages and attorney's fees.
Ms. Berry also demanded a judgment for an accounting of the monies paid to Aetna, City Insurance Co. and Burt Young, and the coverages therefor; for the monies due plaintiff on that accounting; for costs of suit; attorney's fees for the entire action; and, for "an accounting of all sums due to insureds throughout Mississippi where corporations have been issued uninsured motorist policies, whereby no liability can accrue therefor."
Young and City filed an answer to the complaint on January 8, 1988, moving the chancery court to dismiss the complaint and alternatively to transfer the cause to the circuit court of Rankin County. Young and City furthermore moved the chancery court to sever the claims against the defendants and transfer the cause to the circuit court of Copiah County, Mississippi. The Young and City motion to transfer was denied on January 9, 1989. Jackson Excavating and Leasing Company, Inc. and Walter J. Evans, Jr. also moved the court to transfer and sever. The court denied that motion on June 30, 1988, stating, among other things, that the two Rankin County resident defendants (Dumbauld and Bayless) were dismissed from the suit, but added that their dismissal did not deprive the court of jurisdiction. Further, the summary judgment motions filed by Young, City and Aetna were denied by the court. Aetna asserted the affirmative defenses of res judicata, election of remedies, and collateral estoppel in its answer to Ms. Berry's complaint. Aetna also filed a motion to dismiss based on those issues.
Trial was held in one to five day increments beginning with motions argued on December 8, 1988. Testimony began in January, 1989 and concluded in July, 1990. The trial extended over a period of approximately nineteen months.
At the close of Ms. Berry's case, Judge Bridges considered motions by the various defendants. He initially granted Young and City's motion for directed verdict, but later amended that ruling and reinstated Young and City as defendants after being reminded of certain testimony by Ms. Berry's counsel. The chancellor did leave his initial dismissal of the bad faith and punitive damages portion of the claim against Young and City intact. The court also granted Jackson Excavating's motion as to punitive damages only, and denied Aetna's motion to dismiss. In his written explanation denying Aetna's motion to dismiss, the chancellor did not address the res judicata and collateral estoppel issues.
Aetna requested the United States District Court for the Southern District of Mississippi, Judge Lee, to issue a temporary restraining order and a permanent injunction against the chancery court proceeding in order to protect the district court's prior judgment. Aetna's arguments were based on the theories of res judicata and collateral estoppel. Although Judge Lee denied the relief sought by Aetna, he did state that Ms. Berry's claims in chancery court were either brought or could have been brought in the prior district court case. The district court was not convinced Aetna had proven prior litigation of all the issues so as to avoid violating the federal Anti-Injunction Act. It is noteworthy that the district court had difficulty determining exactly what claims Ms. Berry was advancing in the chancery court action, and furthermore expressed hope that Aetna's position on the res judicata and collateral estoppel issues would ultimately be vindicated in the state courts.
The defendants concluded their case on July 26, 1990. On July 30, 1990, each of the defendants renewed all their previous motions and the court requested all parties to submit briefs in support thereof.
Chancellor Bridges addressed and denied Aetna's res judicata and collateral estoppel *61 claims in his Memorandum Opinion and Judgment entered December 4, 1990. The Memorandum Opinion and Judgment, as alleged in the briefs submitted by Aetna, Young, and City, copied significant portions of Ms. Berry's proposed findings and conclusions of law drafted by attorney Roland Lewis. As pointed out by Ms. Berry, however, other portions of the proposed findings and conclusions of law, especially with regard to defendants Jackson Excavating and Leasing Company and Walter J. Evans, Jr., and amount of monetary judgment awarded against Aetna, Young, and City, were deleted and changed by chancellor Bridges.
The chancellor entered judgment against the defendants and awarded the following damages:
1. $500,000.00 to Ms. Berry as administratrix of Mr. Berry's estate against Willie Davis for the wrongful death of Mr. Berry.
2. $400,000.00 to Ms. Berry individually in actual damages against Aetna, Young, and City jointly and severally for the negligent actions of Young and City.
3. $200,000.00 against Aetna, Young, and City in actual damages to Ms. Berry as administratrix of her husband's estate for the actions of Young and City.
4. $2,252.00 to Ms. Berry individually against Young, City and Aetna jointly and severally for the "amount of unnecessary insurance premiums charged to, and paid by, Mrs. Cherry Berry for automobile insurance from 1982 until 1984."
5. $500,000.00 against Aetna in actual damages for Ms. Berry's emotional distress.
6. $500,000.00 against Aetna in actual damages for Ms. Berry's economic loss.
7. $500,000.00 to Mr. Berry's estate for economic loss.
8. $1,000,000.00 against Aetna to Ms. Berry "for punitive damages for its bad faith actions in wrongfully denying her uninsured motorist benefits. .. ."
9. $1,000,000.00 against Aetna to Mr. Berry's estate in punitive damages for the bad faith denial of UM coverage.
10. $2,000.00 against Aetna to Ms. Berry for medical benefits.
11. $250,000.00 against Aetna for punitive damages for bad faith refusal to pay medical benefits.
12. $2,000.00 against Aetna for funeral bills.
On December 18, 1990, the chancellor entered an amended order relieving Jackson Excavating and Leasing Company, Inc. and Walter J. Evans, Jr. of any liability. On April 19, 1991, Jackson Excavating and Walter Evans filed, in the chancery court, a Protective Notice of Cross-Appeal To The Supreme Court, stating that the chancellor was correct in finding them not liable to Ms. Berry, and further stating that "these separate Defendants wish to preserve on appeal their arguments regarding venue, jurisdiction and their right to trial by jury." Jackson Excavating and Walter Evans further alleged that the chancellor erred in denying their Motion to Transfer or Sever and in refusing to afford them a trial by jury. Finally, in the event this Court reverses the chancery court, they requested that the cause against them be remanded to the Copiah County circuit court "where venue and jurisdiction are proper."
Jackson Excavating and Leasing Company and Walter Evans did not submit briefs on appeal. Additionally, although defendants Young, City, and Aetna included Jackson Excavating and Walter Evans as parties to this appeal in the style of the case on the front of their briefs, Ms. Berry only indicated that Young, City, and Aetna were parties to this appeal. Jackson Excavating and Walter Evans are certainly not aggrieved by the chancellor's determination that they are not in any way liable to Ms. Berry, and Ms. Berry has not cross-appealed that finding.
On December 28, 1990, Aetna filed a motion to alter or amend judgment, or alternatively, for a new trial. The defendants also filed a motion requesting chancellor Bridges to recuse himself from any further consideration of the case. Roger Clapp, the newly elected chancellor, held a hearing on the various matters on January 8, 1991. Chancellor Clapp, having recently defeated Judge Bridges in the election, recused himself from the case. Chancellor Clapp stated that the race against Judge Bridges "could be described *62 as an energetic campaign in which Mr. Harrell (co-counsel for Ms. Berry with Roland Lewis) was involved deeply."
Although it had been chancellor Clapp's intention to appoint chancellor Bridges as special master to rule on the pending motions in this case, after reading the motions for recusal, he determined that he "would not be able to refer him the case...." Judge Clapp then requested this Court to appoint a chancellor to rule on the post-trial motions.
Ms. Berry filed a Petition for Extraordinary Relief on January 16, 1991. This Court, before a panel consisting of Roy Noble Lee, C.J., Robertson, and McRae, J.J., issued an Order suspending Miss.Sup.Ct.R. 4(d), and allowed the parties to file notices of appeal and proceed on appeal in this Court. The pending post-trial motions were "deemed denied" as of the date of the order, March 20, 1991. From that order and the judgment rendered by Judge Bridges, the parties filed their notices of appeal and briefed the following issues for our consideration:
ISSUES APPEALED BY AETNA:
1. Whether Aetna is entitled on appeal to de novo review of factual errors committed by the chancellor, in light of the fact that Aetna's post-trial motion to amend the judgment or for a new trial was denied without consideration on its merits by any court?
2. Whether the chancery court erred when it denied Aetna's motion to dismiss this suit as barred by res judicata and/or collateral estoppel, in light of the final judgment in a prior federal court action between Aetna and Mrs. Berry involving claims for uninsured motorist benefits, medical payment benefits, and punitive damages arising out of the same accident and insurance policy involved in this suit?
3. Did the chancery court violate provisions of the United States Constitution when it failed to give preclusive effect to the prior judgment in the federal court action between Aetna and Mrs. Berry?
4. Do the clear factual errors in the chancellor's opinion and judgment against Aetna require reversal of the judgment against Aetna?
5. Does Mississippi's procedure for awarding and providing review of awards of punitive damages, including the chancellor's award of punitive damages against Aetna in this case, violate the Due Process clauses of the Fourteenth Amendment to the United States Constitution and Article 3, Section 14 of the Mississippi Constitution?
ISSUES APPEALED BY BURT YOUNG AND CITY INSURANCE:
I. THE CHANCELLOR ERRED IN DENYING THE YOUNG AND CITY MOTION FOR SUMMARY JUDGMENT:
A. The court erred in holding that the plaintiff's action was not barred by the statute of limitations, where the policy which was allegedly written in a negligent manner was delivered nearly seven years before suit was filed.
B. The plaintiff is barred from contending that the policy did not provide the coverage requested when the policy had been accepted and no complaint had been made for over eleven months that it did not provide the appropriate coverage.
C. Having chosen to litigate to a final judgment her contention that the Aetna policy provided uninsured motorist coverage, the plaintiff was barred by the doctrine of election of remedies from pursuing the inconsistent claim against Young and City that they negligently failed to provide uninsured motorist coverage.
D. The plaintiff's suit was barred by res judicata.
II. YOUNG AND CITY WERE DENIED THEIR CONSTITUTIONAL RIGHT TO A FAIR TRIAL:
A. The chancery court of Rankin County, Mississippi had no jurisdiction to hear this case, and erred in denying the defendants' motion to transfer the case to circuit court.
B. The chancellor should have recused himself pursuant to Rule 3C of the *63 Code of Judicial Conduct, because of his relationship with the plaintiff's attorney.
C. The chancellor's findings of fact as to Young and City were unsupported by the evidence and the law.
III. YOUNG AND CITY VIOLATED NO DUTY TO THE PLAINTIFF AND WERE NOT GUILTY OF ANY NEGLIGENCE.

THE FACTUAL BACKGROUND
On November 14, 1981, Jack Berry (Mr. Berry), Cherry Berry (Ms. Berry), and Mr. Berry's daughter and son-in-law, ate dinner in Jackson at Dennery's restaurant and drove back towards Crystal Springs. Ms. Berry was driving a 1982 Bonneville station wagon and Mr. Berry was in the front passenger seat  the daughter and son-in-law were in the back seat. The station wagon was owned by a GM district representative.
At approximately 9:00 p.m. they were travelling northbound on Highway 51, just south of Crystal Springs. Willie Davis, an uninsured drunk driver, was driving a 1971 Ford LTD heading southbound on Highway 51. A white pick-up truck owned by Jackson Excavating and Leasing Company and driven by Walter Evans was stopped in the southbound lane, apparently waiting to take a left turn. Willie Davis did not see the truck stopped in his lane until it was too late. He swerved at the last moment to miss it, hit the left rear of the pick-up, and ran head-on into the station wagon being driven by Ms. Berry.
Copiah County Sheriff Thomas Jackson witnessed the accident and stated that he thought a lens was out on the back of the truck. He also testified that Willie Davis was travelling at an excessive rate of speed. Plaintiff's accident reconstruction expert witness, Alvin Doyle, testified that in his professional opinion the pick-up truck was a contributing factor to the accident.
Ms. Berry testified that her husband suffered before he died as a result of the accident. She furthermore testified to the various injuries she suffered, including a fractured right arm, lacerations and bruises. Dr. Pineda, Ms. Berry's physician, testified that as a result of the accident and emotional strain, Ms. Berry has suffered physical and psychological ailments over the years. Ms. Berry did, however, state on a questionnaire in 1982 that her health was good.
Ms. Berry operated the Berry Pontiac business after her husband's death. She attributed the loss of the business (Berry Pontiac was sold for $300,000.00 in 1986) to having too little working capital after her husband died. On cross, Ms. Berry testified that her husband's estate was appraised at $1.3 million at the time of his death. Also, the Berry Pontiac business began losing money in 1979 and still showed significant losses for the year 1981 ($224,148.00). Mr. Berry did not die until Nov. 14, 1981. Berry Pontiac showed a loss for 1983 of $268,119.00. That same year, Ms. Berry purchased a new car ($29,000.00), new boat ($11,000.00) and a new motor home ($34,000.00). After her husband's death, Ms. Berry got the house, the farmhouse, and admitted to withdrawing $114,000.00 from her and her husband's joint accounts. She received approximately $150,000.00 to $160,000.00 in insurance proceeds when her house burned in 1986.
Prior to his death, Jack Berry owned and operated Berry Pontiac-GMC, a GM car dealership. There was some dispute in the record as to whether Mr. Berry owned all the stock or only 60% of the stock. Burt Young, an independent insurance agent and friend of the Berrys, solicited Mr. Berry's insurance business on several occasions from 1970 to 1980. Before the policy in question in this case was issued, Berry Pontiac's insurance was covered by a garage policy issued by West American Insurance Company through the Faust-Arrington Agency.
According to Burt Young, when Mr. Faust of Faust-Arrington died, Mr. Berry called him on the phone and requested he come to the dealership to discuss insurance. Young met Mr. Berry for that purpose initially in July, 1980. He testified that only he and Mr. Berry were present at that meeting. At that time, he reviewed the Faust-Arrington policy covering Berry Pontiac. Young made some notes and had Aetna, through John Nelson (Nelson  the unit manager in the commercial *64 underwriting division), furnish a tentative quote.
Young stated that when he and Mr. Berry met in October of 1980, Mr. Berry had recently received a renewal quote from the Faust-Arrington Agency and asked Young to duplicate it. Young testified that he and Mr. Berry were the only two people at this meeting, and specifically stated that Ms. Berry was not present. When he first looked at the renewal quote from Faust-Arrington, Young told Mr. Berry that he would like to recommend a couple of changes, at which time, according to Young, Mr. Berry said "Burt, if you can duplicate this coverage, fine. If you can't, I can find an agent that can."
Young testified that had he been given the opportunity, he would have suggested that Mr. Berry add his name as an additional named insured. Young admitted that normally he recommends to all his corporate clients that own 51% or more of a corporation to add their name as an individual insured under the corporate policy. Also, Keith Bayless, an Aetna claims manager, testified that it would have been proper to add Mr. Berry's name to the main policy, and that if that had been done, he would have had the same coverage as was provided by the DOC endorsement for which an additional premium had been charged.
Young testified that the prior policy issued by West American Insurance Company through the Faust-Arrington Agency provided UM coverage with limits of $10,000.00 per person and $20,000 per accident, but the renewal quote submitted by Faust-Arrington for the year 12/80 to 12/81 that Mr. Berry asked Young to duplicate did not provide UM coverage. Further, the prior Faust-Arrington policy provided UM coverage for "[a]ny highway vehicle to which are attached dealer's license plates issued to the named insured."
The prior policy and renewal quote issued through Faust-Arrington, Young's application submitted to Aetna, as well as the Aetna quote and policy, named the Berry Pontiac corporation as the named insured. Young did not request UM coverage when he submitted the application to Aetna. However, Aetna provided that coverage anyway, and Mr. Berry accepted the policy with UM coverage at $25,000.00 for eight dealer's plates and the DOC endorsement that provided personal liability insurance to Mr. Berry but did not include a premium charge for UM coverage.
Gay Powell worked at City Insurance Company and assisted Young. She generally corroborated his testimony as to how the policy in question came to be issued to Berry Pontiac. She prepared an application for Berry Pontiac using the Faust-Arrington quote, did not request UM coverage on the main garage policy, and did not request Aetna to issue a DOC endorsement. John Nelson (Nelson), an Aetna underwriter, added the UM coverage on the main garage policy for eight dealer's plates, and added the DOC endorsement giving Mr. Berry liability and medical coverage when driving cars not owned by Berry Pontiac.
According to Nelson:
The proper way to provide individual coverage for a corporate officer is to provide drive other car coverage endorsement. That's the purpose of the endorsement. As a corporate officer driving a corporate car, if they were to borrow or use someone else's vehicle, a nonowned vehicle, they would have no personal coverage. The corporate policy does not extend to the individual unless you add the drive other car endorsement, and that's the purpose of it.
The reason advanced by Nelson that it would have been improper to add Mr. Berry's name to the main garage corporate policy is that it could then be construed to give coverage to other businesses (unknown to the insurance company) owned by the corporate executive.
Nelson also stated that it would have been highly unusual in 1980, as well as at the time of his testimony, to provide UM coverage in the same amount as liability coverage. In fact, he said it would have been highly unusual to provide more than $25,000.00 in UM coverage. He also testified that code 22 (coverage for owned autos only) was used on the garage policy for UM coverage which was standard. Code 21 (coverage for any auto) was used for liability and medical coverage. *65 On cross-examination, however, Nelson stated that had Mr. Berry's name been added to the main policy along with the corporation, he would have been insured for UM coverage on the night he died.
On re-direct examination, Nelson took his time to explain and answer the same question asked by attorney Lewis with regard to adding Mr. Berry's name to the corporate policy. He said that given the fact that the garage policy contained the symbol 22 under UM coverage, standing for owned autos only, even if Mr. Berry's name had been added on the policy along with the corporation, he would not have been covered for an accident while occupying a non-owned vehicle.
Ms. Berry said she was present for the meetings and that Mr. Berry asked Young for "full coverage." Ms. Berry did not remember Mr. Berry asking Young to duplicate the prior Faust-Arrington policy. She said the only discussion that took place with regard to Berry Pontiac's prior coverage was Mr. Berry telling Young, "Burt, I want you to take as good care of me as Tim (Faust) did. I want you to give me full coverage. When I call you, I want you to be there and I just want you to take care of all my needs...." On cross examination, Ms. Berry testified that her understanding of full coverage was that they would be "covered for any type of liability that [they] might incur." (emphasis added) She further testified that Young never explained UM coverage to them and that they were never given the opportunity to reject UM coverage for the DOC endorsement.
On July 25, 1988, plaintiffs responded to request for admissions No. 1 admitting "that the Aetna policy of insurance in question was delivered to Berry-Pontiac-GMC, Inc., on or about November 21, 1980, effective December 3, 1980." Ms. Berry also stated that no information known or readily obtainable to her enabled her to admit or deny the exact date of delivery. She also admitted that the policy was delivered to Mr. Berry at Berry Pontiac and kept in the safe in the business office. Ms. Berry's lawyer, Roland Lewis, then brought to the court's attention that Ms. Berry supplemented her responses on this issue to argue that whatever was delivered was defective and not a valid policy of insurance.
Further complicating the question of whether or not the policy was in fact delivered is that it appears as though at least part of the policy, although it is difficult to determine which part, was not delivered to Mr. Berry. Nelson, Aetna underwriter, submitted an affidavit saying that the policy, "although providing uninsured motorists coverage with policy limits of $25,000.00, limits for any one accident or loss, was, through oversight, delivered to Berry Pontiac-GMC, Inc., without the uninsured motorists endorsement having been attached." Aetna made this same assertion in its brief in support of summary judgment in the district court. It is not clear, however, whether the uninsured motorists endorsement is the same document as the DOC endorsement.
The DOC endorsement states that it changes policy number 87 FX 12737 CCA V (the main garage corporate policy) by naming Mr. Berry as an individual insured for liability and Auto Med. Pay. It does not charge a premium for UM coverage.
On November 30, 1981, approximately two weeks after the accident, Ms. Berry brought three suits in federal district court. The suits were consolidated and litigated for several years.
Helen Baker (Baker) worked for Aetna in the claims department in Jackson in 1981 and was assigned the Berry claim. She was assigned this case on November 20, 1981 and immediately began work on the Berry file. Baker testified that she followed up on the accident, talked to the sheriff's office, and determined that Willie Davis was in fact uninsured. Her investigation also informed her that a GM representative borrowed the Berrys' van and left them the Bonneville station wagon.
She said she talked to attorney Lewis shortly after being assigned to handle the Berry claim. She informed Lewis that she was going on Thanksgiving holidays and would speak to him on December 1, 1981. Baker corroborated testimony elicited from Young and Gay Powell that Ms. Berry, through attorney Lewis, never submitted her *66 medical bills in order to process that portion of the claim. Baker testified that in her first conversation with Lewis, she informed him that Aetna would pay $25,000.00 plus medical payments if the Royal Globe policy limits were not satisfactory. Aetna believed the Royal Globe policy was primary and the Aetna policy was excess coverage.
When Baker next spoke with Lewis, approximately December 1, 1981, he informed her that he was not interested in Aetna's "little piddly policy," and wanted to know what GM (Royal Globe) had to offer. Subsequent to that conversation, Baker learned that Royal Globe planned to combat the claim asserting that the Berrys did not have permissive use of the station wagon at the time of the accident. She again asked Lewis to send medical bills and he again indicated he was not interested in Aetna and instead was pursuing GM's money. Mr. Bill Dumbauld (Dumbauld), Aetna's state commercial insurance division claim manager, testified that the $25,000.00 offer was made and never withdrawn by Aetna. It was his position that Aetna gave the Berry Pontiac policy the benefit of the doubt and "bent over backwards" to handle this claim.
Initially, Baker reserved $25,000.00 for UM limits on this accident, but testified that was not a legal conclusion that the Berrys were covered. Aetna changed its position with regard to estimated liability when we handed down the case. Government Employees Insurance Co. v. Brown, 446 So.2d 1002 (Miss. 1984). Government Employees Insurance Co. held that "stacking" of UM coverage under one insurance policy containing separate premiums shall be permitted up to the number of separate premiums charged. Id. at 1006. In this case, Aetna charged UM premiums for eight dealer's plates for a coverage of $25,000.00 apiece or $200,000.00 ($25,000 x eight) aggregate UM coverage. Thus, based on the "stacking" rule pronounced in Government Employees Insurance Co., Aetna changed its reserve in this case from $25,000.00 to $200,000.00 for potential liability under the policy.
According to Aetna, the $200,000.00 was offered to Ms. Berry through her attorney, Roland Lewis. Baker and Dumbauld both testified that Jim Bullock (Bullock), counsel for Aetna, was authorized to make the $200,000.00 offer. Bullock told Baker he had tendered the offer to Lewis in late summer or early fall of 1984. According to the testimony of Dumbauld, the offer was rejected by Ms. Berry/Roland Lewis. Roland Lewis, counsel along with Fred Harrell for Ms. Berry, stated on the record: "Mr. Bullock offered us the $200,000.00, but we didn't accept it because we knew it (the Berry-Pontiac policy) was going to stack 37 times, because that's how many cars the automobile dealership owned."
Mike Hale was called by Ms. Berry and qualified as an expert in handling insurance claims and claims files. He testified that Aetna did not properly handle this claim. He claimed Aetna violated its own policies and procedures with regard to handling claims. Hale said there was no indication Aetna attempted to develop the information necessary to pay Ms. Berry's medical claims, and further stated:
They dealt in bad faith with the insured by their continuous indifference to the claim before them and the benefits they owed under the policy.
He admitted on cross-examination that Ms. Berry's early hiring of Lewis and filing of suit was not the best way to handle the situation. That is, it would have been better to give Aetna the time to work internally to develop a position on the claim  company policy was 30 days. Since Ms. Berry filed a lawsuit on November 30, 1981, and Lewis did not have any real contact with Baker (who handled the claim for Aetna) until December 1, 1981, Aetna was in a position of defending this suit prior to attempting to conclude the case with the insured.

STATEMENT OF THE LAW
Because we find the following issue to be dispositive of Ms. Berry's entire claim against Aetna, the remaining assignments set forth in Aetna's brief need not be discussed:

I.

WAS MS. BERRY'S SUIT AGAINST AETNA BARRED BY RES JUDICATA?
Aetna argues that Ms. Berry's chancery court suit should have been held barred by *67 res judicata. Aetna contends Ms. Berry's claims in the chancery court suit should have been barred because they either were determined or could have been brought in the earlier district court action. Ms. Berry asserts that her chancery court action was not subject to the doctrine of res judicata because her claims in the chancery court suit were legally and factually distinguishable from those brought earlier in the district court.
The rule of law known as res judicata holds that when a court of competent jurisdiction enters a final judgment on the merits of an action, the parties or their privies are precluded from relitigating claims that were decided or could have been raised in that action. Walton v. Bourgeois, 512 So.2d 698, 700 (Miss. 1987). There are four identities that must be present before a subsequent action may be dismissed on the grounds of res judicata:
(1) identity of the subject matter of the original action when compared with the action now sought to be precluded; (2) identity of underlying facts and circumstances upon which a claim is asserted and relief sought in the two actions; (3) identity of the parties to the two actions, an identity met where a party to the one action was in privity with a party to the other; and (4) identity of the quality or character of a person against whom the claim is made.
Dunaway v. W.H. Hopper & Associates, Inc., 422 So.2d 749, 751 (Miss. 1992).
A party is precluded from raising a claim in a subsequent action if the four identities of res judicata are present. This is so regardless of whether all grounds for possible recovery were litigated or asserted in the prior action, so long as those grounds were available to a party and should have been asserted. Dunaway, at 751 (citing Key v. Wise, 629 F.2d 1049, 1063 (5th Cir.1980), reh. denied, 645 F.2d 72 (5th Cir.1981), cert. denied, 454 U.S. 1103, 102 S.Ct. 682, 70 L.Ed.2d 647 (1981)). Further, "[w]here one has a choice of more than one theory of recovery for a given wrong, she may not assert them serially in successive actions but must advance all at once on pain of the bar of res judicata." Walton, 512 So.2d at 702.
The bar of collateral estoppel is related to res judicata, but is slightly different in nature. "When collateral estoppel is applicable, the parties will be precluded from relitigating a specific issue actually litigated, determined by, and essential to the judgment in a former action, even though a different cause of action is the subject of the subsequent action." Dunaway, at 751 (citing Lee v. Wiley Buntin Adjuster, Inc., 204 So.2d 479 (Miss. 1967)); Lyle Cashion Co. v. McKendrick, 227 Miss. 894, 87 So.2d 289 (1956). See also McIntosh v. Johnson, 649 So.2d 190 (Miss. 1995) (clarifying distinction between doctrines of res judicata and collateral estoppel).
Ms. Berry claims that the subject matter and underlying facts of the two suits are different, and therefore, the chancery court was correct in not dismissing her chancery court claim. Thus she essentially claims that two of the above mentioned necessary identities are not met in this case to support Aetna's claim. She contends that the negligence of Willie B. Davis (uninsured drunk driver) formed the factual basis of the first action in which she sought UM coverage, but that "the Berrys were also injured financially by Aetna's own negligence, fraud, and bad faith, and by the negligence of Aetna's agent Young."
Ms. Berry also claims she litigated to recover the amount of UM coverage due under the Aetna policy in the first action, and that the first notice she had that UM coverage was being denied by Aetna, thereby revealing to her a deficiency in the policy, was Aetna's Motion for Summary Judgment filed in the district court. Ms. Berry argues that she did not bring an action for bad faith or for medical payments under the policy in her first action, and that the district court made no ruling with regard to those issues.
However, Ms. Berry filed a Motion For Leave to File Amended Complaint in the district court alleging "additional grounds, including bad faith," on the part of Aetna. Moreover, in Ms. Berry's district court Motion For Summary Judgment, she stated that Aetna was guilty of the intentional tort of *68 bad faith because it wrongfully denied her UM coverage under the policy. Ms. Berry argues that because her Motion For Leave to File Amended Complaint was never ruled on by the district court, and because Royal Globe filed a response to her summary judgment motion stating she had not effectively raised a bad faith claim, she is thereby vindicated as having never asserted bad faith against Aetna in the earlier action.
We conclude that whether or not Ms. Berry's intention to assert the bad faith issues ever materialized in the form of filed pleadings is irrelevant for our consideration of this issue. Even if she did not technically raise the issues of Aetna's bad faith and Agent Young's negligence, we cannot seriously question the fact that she could have after a careful examination of the district court record. Furthermore, the district court acknowledged in its refusal to grant Aetna's TRO request that
[i]mplicitly, the court concluded that Mrs. Berry could not recover punitive damages based on Aetna's having failed and refused to pay her claim for UM benefits since there was no coverage, that is, the insurer did not act in bad faith in failing to pay benefits that it did not owe.
This statement from the district court supports a finding that Ms. Berry not only could have asserted bad faith in the first suit, but did.
Further, we disagree with Ms. Berry's contention that she did not seek medical payments under the policy in the district court case. Ms. Berry attributes her request for relief with respect to injuries and medical bills in federal court as only being relevant to the portion of her pleadings alleging Willie Davis' negligence and liability. She states that she "did not make a claim under the medical payment provision of the policy, and there was no allegation before the federal court that such a claim had been denied by Aetna."
This may be true; however, as Ms. Berry asserted in her testimony in the chancery court case, if she did in fact submit medical bills to Burt Young (agent for Ms. Berry through which Aetna issued the policy) two to three weeks after the accident, and if, as she testified, those bills were never honored, she full well knew that before or shortly after the filing of the federal court case. She could have claimed that Aetna owed her for injuries and bills under the medical payments provision of the policy. She filed an amended complaint in the federal case as late as September, 1984.
In Smith v. Safeco Ins. Co., 863 F.2d 403 (5th Cir.1989), the plaintiff first brought suit in district court for punitive damages under an insurance contract for the insurer's refusal to pay a claim under the policy for medical expenses. The Court of Appeals ruled that res judicata barred the second suit in which the plaintiff sought to collect underinsured motorist benefits under the same insurance policy. The Safeco court held:
In determining the preclusive effect of a federal judgment, this circuit applies the Restatement's transaction test. Restatement (Second) of Judgments § 24 (1982); Southmark Properties v. Charles House Corp., 742 F.2d 862, 870-71 (5th Cir.1984); Nilsen v. City of Moss Point, 701 F.2d 556, 560-61 (5th Cir.1983). Applying this rule, Smith's first action extinguished all of Smith's claims against Safeco "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement at § 24. All of Smith's claims against Safeco sought coverage under a single insurance policy for injuries resulting from one accident. These claims arise out of a common nucleus of operative fact, and comprise a single transaction. (citations omitted). Smith was required to bring all of his claims or causes of action against Safeco that arose out of the crash. His second action against Safeco is precluded.
Id. at 404. Ms. Berry claims that because her suits were brought in reverse order, that is, because she claimed UM coverage in the first action and then sought punitive damages in the second action, Safeco is not applicable. Aetna argues that Ms. Berry's distinction is one without a difference. Aetna has the better of the two arguments on this issue.
*69 Just as in Safeco, Ms. Berry's two claims stem from a "common nucleus of operative fact," and even assuming arguendo that she did not raise bad faith and medical damages claims in the district court case, it is clear that she could have. The Aetna insurance policy and coverage it offered was certainly relevant to the chancellor's decision on the issue of Aetna's alleged bad faith refusal to pay UM coverage. The only way the chancellor could determine Aetna was guilty of bad faith refusal to pay benefits under the policy was to find that (1) Mr. Berry was covered when the fatal accident occurred, or (2) that Aetna believed he was covered and failed to pay.
The problem with the first of these two theories is that the district court made the determination that Jack Berry was not covered for this accident under the policy. Only because Aetna never obtained a waiver in writing of UM coverage on the DOC endorsement did the district court award Ms. Berry $10,000.00 damages (the UM statutory minimum)  not because Mr. Berry was covered, but because he should have been up to $10,000.00.
With regard to the theory that Aetna was guilty of bad faith because those representatives handling the claim believed Mr. Berry was covered and still refused to pay, there are several problems. First, Ms. Berry's counsel, Roland Lewis, was clearly told by Aetna early in these proceedings that Aetna's coverage, if any, was only excess to the Royal Globe policy. Further, Aetna's answer in the district court case also supports the fact that Ms. Berry was on notice that Aetna denied that Ms. Berry was entitled to "any sum against it as compensatory damages" or punitive damages. Aetna clearly established in its answer that Royal Globe's policy was primary, and only "if plaintiff shall establish her claim for damages," would she be entitled to coverage from Aetna  after exhausting the Royal Globe policy limits. Further, Roland Lewis admitted on the record in the chancery court case that he had been made a settlement offer by attorney Jim Bullock for Aetna in the amount of $200,000.00.
All these claims against Aetna were either raised and disposed of by the district court, clearly available to Ms. Berry early on in the district court case, or nullified by Aetna's settlement offers. The chancery court should not have allowed Ms. Berry's case against Aetna to proceed.
Aetna also argues that the remainder of Ms. Berry's claims against it are barred by res judicata. Those claims are that Aetna overcharged premiums and that Burt Young negligently procured coverage for the Berrys. Ms. Berry argues that these claims were obviously not based on the same accident and the same insurance policy as her claim for UM benefits.
However, the negligent procurement claim obviously pertains to Young's procurement of the policy at issue in the district court case. The deficiency Ms. Berry complains about is that Young never told the Berrys about UM coverage, never gave them an opportunity to reject UM coverage, and that Mr. Berry's name could have been added to the policy in order to obtain UM coverage at no extra charge  i.e., if Young had properly consulted with Mr. Berry as to his insurance needs, he would have been covered under the policy for this fatal accident.
If in fact the chancellor is correct that the overcharging of premiums and negligent procurement violations extended beyond the date of the filing of the federal action and throughout the proceeding of this matter in that court, it must be remembered that Ms. Berry filed an amended complaint as late as September 12, 1984. The last policy issued was in effect in December, 1983. All the policies that could serve as the basis for Ms. Berry's claims were issued prior to the time Ms. Berry filed her second amended complaint.
Even if Aetna's position as to coverage was at one time arguably confusing (though it should be kept in mind that Aetna claimed to be only excess to the Royal Globe policy coverage at an early stage of this litigation), by the time Ms. Berry filed her second amended complaint there was certainly no doubt that Aetna was denying UM coverage. The facts surrounding the issuance of the policy were litigated in the district court suit *70 against Aetna. That was the forum in which Ms. Berry should have asserted that Aetna was liable for Young's negligent failure to inform Mr. Berry about UM coverage.
Finally, contrary to the chancellor's holding, the fact that the district court case was decided in favor of Aetna by way of summary judgment does not lessen the preclusive nature of that decision. Exhibitors Poster Exchange, Inc. v. National Screen Serv. Corp., 421 F.2d 1313, 1319 (5th Cir.1970). Ms. Berry's claims filed against Aetna in the Rankin County Chancery Court were barred by res judicata.

II.

WAS IT ERROR TO DENY SUMMARY JUDGMENT TO YOUNG AND CITY?
Young and City's first assignment of error contains four subsections. Young and City claim that the chancellor erred in denying their Motion For Summary Judgment filed on December 15, 1988, and denied on January 9, 1989.
The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the trial court under Rule 56(c). This Court conducts de novo review of orders granting or denying summary judgment and looks at all
the evidentiary matters before it  admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt.
(citations omitted)
Mantachie Nat. Gas v. Miss. Valley Gas Co., 594 So.2d 1170, 1172 (Miss. 1992). If there is doubt as to whether or not a fact issue exists, it should be resolved in favor of the non-moving party. That is, it is better to err on the side of denying a motion for summary judgment if a doubt exists as to whether a genuine issue of fact exists. Ratliff v. Ratliff, 500 So.2d 981, 981 (Miss. 1986).

A. WAS THE ACTION BARRED BY THE STATUTE OF LIMITATIONS?
Young and City argue that it is indisputable that the chancery court suit was filed more than six years after the allegedly deficient insurance policy was delivered. Therefore, any negligence attributable to Young/City occurred on the date of delivery of the policy. Young and City assert that this occurred on or before December 3, 1980, the effective date of the policy.
Young and City's brief further states:
It is clear that the policy was delivered to Jack Berry and the policy declaration said on its face that Berry Pontiac-GMC, Inc. was the only named insured. The declarations page said that there was $25,000.00 uninsured motorist coverage. The drive other car endorsement made no mention of uninsured motorist coverage. If this policy, delivered on December 3, 1980, was not what the plaintiffs wanted, then any cause of action that the plaintiffs had against Burt Young accrued on that day.
For Young and City's argument that the chancellor committed error by denying their motion for summary judgment to succeed, there must not be any genuine issue regarding the foregoing facts. Their entire argument that Ms. Berry's claim was barred by the statute of limitations hinges on their assertion that Mr. Berry received the policy on or before December 3, 1980, and that the wrong therefore occurred on that day.
This subsection of this assignment can be dispensed with quickly. There exists a factual dispute in the record as to whether the entire policy was ever delivered. John Nelson, Aetna underwriter, submitted an affidavit that states that the policy, "although providing *71 uninsured motorists coverage with policy limits of $25,000.00, limits for any one accident or loss, was, through oversight, delivered to Berry Pontiac  GMC, Inc., without the uninsured motorists endorsement having been attached." Further, Aetna asserted this same thing when it moved the district court for summary judgment. Because, viewing the evidence in a light most favorable to Ms. Berry, there existed a fact question about whether the complete policy was delivered, Young and City's argument on this issue must fail.
Young and City were not entitled to summary judgment on this issue, nor were they otherwise entitled to relief based on the claim that Ms. Berry was time barred.

B. IS THE ACTION AGAINST YOUNG AND CITY BARRED BY ESTOPPEL?
Here Young and City argue that the Berrys accepted the insurance policy, held it for eleven months with no complaint that the policy did not provide them with the insurance they wanted, and should now be estopped from arguing that the policy did not meet their needs. Young and City rely on Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416 (Miss. 1987), wherein this Court stated that knowledge of the contents of an insurance policy/contract is imputed to the parties as a matter of law. Further, Young and City argue that once a party accepts an insurance policy for a reasonable amount of time and makes no complaint about the coverage, the insured is bound by the provisions of the policy. Atlas Roofing Mfg. Co. v. Robinson & Julienne, Inc., 279 So.2d 625 (Miss. 1973).
However, in the Cherry case, this Court found the insurance contract in issue to be completely unambiguous, and therefore the appellants would be held to the coverage that was clearly indicated in the policy. The imputed knowledge language in that case went to the issue of whether or not the insureds could reasonably argue they were entitled to more coverage. This Court said that clearly they were not because the policy obviously did not provide what they claimed to be entitled to, and furthermore, even if they did not read the policy, the knowledge of its unambiguous contents were imputed to them.
Contrarily, in this case, the insurance policy was ambiguous, as evidenced by Aetna's initial determination of potential liability, the subsequent increase in potential liability to $200,000.00, the settlement offer to that effect, and finally a district court judgment for only $10,000.00  not because Mr. Berry was covered, but because he never waived UM coverage made mandatory by statute.
Furthermore, the Atlas case is not fully on point with Young and City's estoppel argument either. In that case, this Court held that no negligence was attributable to the insurance agent who "acted in good faith and with reasonable diligence," and where the terms of the insurance were fully and fairly disclosed to [the insured], both by cover note and the policy itself. Again, the policy in question was ambiguous, and on that basis, Young and City's estoppel argument must fail.

C. WHETHER THE PLAINTIFF'S SUIT IS BARRED BY ELECTION OF REMEDIES?
Here, Young and City contend that because Ms. Berry litigated a claim in federal court alleging Mr. Berry was entitled to UM coverage under the garage policy issued through Young/City by Aetna, the doctrine of election of remedies should have been held to have precluded her from claiming in chancery court that Young and City were negligent in failing to provide Mr. Berry with UM coverage.
Ms. Berry argues that the election of remedies doctrine only applies when the plaintiff has two or more possible remedies, chooses one, and is successful in pursuing the chosen claim. Thus, Ms. Berry's contention is that she was not successful in the federal district court. Young and City take issue with this, pointing out that Ms. Berry obtained a $10,000.00 money judgment in the federal court action, and argue that therefore, she was successful in her choice of relief.
In the case of O'Briant v. Hull, 208 So.2d 784 (Miss. 1968), we set forth the elements necessary before a defense of election of *72 remedies will lie: (1) the existence of two or more remedies, (2) the inconsistency between such remedies, and (3) a choice of one of them. Further, the O'Briant Court cited 25 Am.Jur.2d where it was said that "the failure to secure satisfaction by means of the remedy adopted does not, it has been held, take the case out of the doctrine of election." However, in continuing to cite 25 Am.Jur.2d, the Court recognized that "[c]ompromise and settlement of a suit may constitute such an election as will preclude the plaintiff from thereafter prosecuting an action based upon a theory inconsistent with that upon which the former action was maintained, but the provisions of the settlement must be carried out." Id. at 786. Additionally, since the plaintiff chose one of two inconsistent remedies, and because the one chosen resulted in "compromise and settlement" for the plaintiff, election of remedies barred her claim. Id. at 787. The Court also noted in the opinion that the doctrine of election of remedies is harsh and should be "disfavored in equity" and not "unduly extended."
It is arguable that Ms. Berry was successful in the district court action. She was awarded $10,000.00. However, that judgment was not the result of Mr. Berry being found to be covered for the accident, as he was deemed to be neither a first class nor second class insured under the policy, but was the result of Aetna's failure to obtain a written waiver from him waiving UM coverage. Thus, keeping in mind this Court's disfavor of upholding an election of remedies defense, Ms. Berry did not litigate her claim to a conclusion that would warrant its application here.
This subsection of this assignment has no merit.

D. WHETHER THE CHANCERY COURT ACTION AS TO YOUNG/CITY SHOULD HAVE BEEN BARRED UNDER THE THEORY OF RES JUDICATA?
The four identities necessary before res judicata is applicable to a cause of action are: (1) identity of the subject matter of the action; (2) identity of the cause of action; (3) identity of the parties to the cause of action; and (4) identity of the quality or character of a person against whom the claim is made. Dunaway v. W.H. Hopper & Associates, Inc., 422 So.2d 749, 751 (Miss. 1982).
Ms. Berry argues that because Young and City were not parties to the federal court action, res judicata does not apply. Young and City concede that they were not parties to that action, but insist that, as agents of Aetna, res judicata applies to them equally. For this statement of the law, Young and City cite Granquist v. Crystal Springs Lumber Company, 190 Miss. 572, 1 So.2d 216 (1941).
We held in Granquist that the plaintiff was barred from bringing a lawsuit against the employer or "master" for the actions of its employee or "servant" for the injuries sustained as a result of the employee's negligent driving. The theory was respondeat superior, and since the claim was based on the same act of negligence already pursued to final judgment against the employee, the subsequent suit was deemed to have merged into the earlier action, determined to have already been satisfied, and barred. Id. at 580-82, 1 So.2d 216. Further, the doctrine of res judicata holds that "[a] final judgment on the merits of an action precludes the parties and their privies from relitigating claims that were or could have been raised" in an earlier action. Johnson v. Howell, 592 So.2d 998, 1002 (Miss. 1991).
We follow the general rule that res judicata only applies when the parties to the two actions are substantially identical. Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416 (Miss. 1987). In Cherry, we further stated:
In the present action, the list of co-defendants includes Haynes Brinkley, Inc. In the first action the Cherrys sued Haynes Brinkley as an individual. We cannot agree that there is not a substantial legal difference between the corporate insurance agency and the individual who runs it. Therefore, the parties of the two actions are not the same, and res judicata does not apply. (Emphasis in the original)
501 So.2d at 418.
We find Cherry to be more on point than Granquist under the present circumstances. *73 If there is a substantial legal difference, for purposes of the res judicata doctrine, between a corporate insurance agency and the individual who runs it, there is likewise a substantial legal difference between the insurance company and the agency through which the insurance policy was issued. A fortiori, Aetna, and Burt Young as the individual agent who procured the Berry business, are not substantially identical parties. The parties to the two actions are not the same. Therefore res judicata does not apply in favor of City Insurance and Burt Young.

III.

WHETHER BURT YOUNG AND CITY INSURANCE RECEIVED A FAIR TRIAL AS GUARANTEED UNDER THE UNITED STATES CONSTITUTION?

A. WERE THE DEFENDANTS DENIED THEIR RIGHT TO TRIAL BY JURY?
Young and City argue that the chancellor erred by not transferring this case to circuit court. Young and City basically accuse Ms. Berry of trying to get around the otherwise legal nature of the claim against them, which would have properly been brought in circuit court, by pretextually claiming she was entitled to an accounting of the premiums paid to Aetna.
Young and City further argue that with today's liberal discovery rules, Ms. Berry could have simply issued interrogatories to obtain the accounting she sought. The thrust of Young and City's argument under this assignment is to suggest that (1) Ms. Berry engaged in forum shopping in order to have chancellor Bridges hear this case; (2) the claim against them was for negligence and fraud; (3) the claim against Aetna was really a breach of contract and bad faith claim; and, (4) this case should be reversed and rendered, or at least remanded for a new trial before an impartial jury.
Ms. Berry argues that this case was properly brought before the chancery court of Rankin County, and that even if the case should have been transferred initially, considering this Court's refusal to grant Young and City's interlocutory appeal to transfer this case coupled with the lengthy trial of this matter, § 147 of the Mississippi Constitution constitutes a complete bar to reversal solely on jurisdictional grounds.
Ms. Berry's argument is persuasive. In Tillotson v. Anders, 551 So.2d 212 (Miss. 1989), we considered the conflict between Miss. Const. Art. 3, § 31, which provides that "the right to trial by jury shall remain inviolate," and Miss. Const. Art. 6, § 147, which states:
No judgment or decree in any chancery or circuit court rendered in a civil cause shall be reversed or annulled on the ground of want of jurisdiction to render said judgment or decree, from any error or mistake as to whether the cause in which it was rendered was of equity or common-law jurisdiction; but if the Supreme Court shall find error in the proceedings other than as to jurisdiction, and it shall be necessary to remand the case, the Supreme Court may remand it to the court which, in its opinion, can best determine the controversy.
The 5-4 majority in Tillotson reversed the chancery court's denial of the motion to dismiss or transfer to circuit court in apparent contradiction to the mandate of Miss. Const. § 147. The majority reasoned that because the appeal was interlocutory, and thus not from a final judgment, the chancery court's decision denying the motion to transfer could be properly reversed. Presiding Justice Hawkins dissented, joined by Dan M. Lee, P.J., and Sullivan and Pittman, J.J., strongly objecting to the majority's holding.
Young and City now want this Court to do what was done in the Tillotson case. However, the present situation is far different. The reasoning behind the majority's decision in Tillotson was that the parties had "not yet endured the slings and arrows of litigation and thus Appellee Anders possesses nothing like the equities of one who has, and who has obtained a final judgment in his favor." Id. at 215. Here, not only have the parties undergone the battle of litigation, but they have done so over a period of several years. It must also be noted that this Court already considered and denied Young and City's request *74 for an interlocutory appeal. Tillotson should not be followed in these circumstances, and we find that the Mississippi Constitution precludes a decision reversing this case for a new trial on jurisdictional grounds.

B. WHETHER THE CHANCELLOR SHOULD HAVE RECUSED HIMSELF IN THIS CASE?
Young and City complain that their rights to due process were violated by the failure of Judge Bridges to recuse himself. Ms. Berry argues that recusal was not required in this case.
Canon 3 C of the Code of Judicial Conduct requires a judge to recuse himself in the following circumstances:
(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; [or]
(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it....
This Court has adopted an objective test to determine when a judge should recuse himself. Jenkins v. State, 570 So.2d 1191, 1192 (Miss. 1990). If a reasonable person, knowing all the circumstances, would harbor doubts about the judge's impartiality, he is required to recuse himself. Also, this Court enforces this judicial ethic "rigorously, notwithstanding the lack of litigant's specific demand." Collins v. Dixie Transport, Inc., 543 So.2d 160, 166 (Miss. 1989).
Fred M. Harrell (Harrell) was co-counsel with Roland Lewis for Ms. Berry in this case. He was associated by Lewis when this case was filed in Rankin County chancery court. Harrell represented Judge Bridges in his 1985 divorce action. Additionally, Judge Clapp, who defeated Judge Bridges in his effort to become re-elected as chancellor, stated that Harrell was "deeply" involved in Judge Bridges' re-election campaign. Further, John McLaurin submitted an affidavit stating that during the course of the chancery court litigation, Judge Bridges contacted him, ex parte, and asked, "John, you do not care how this case turns out do you?"
Ms. Berry argues that this Court should not reverse on this issue because counsel for Young and City knew, or should be held accountable for having known, the circumstances surrounding this case which might lead an objective observer to question the chancellor's impartiality, and yet waited until they received an adverse verdict before raising the issue. In Ryals v. Pigott, 580 So.2d 1140 (Miss. 1990), we refused to accept counsels' excuse for the belated recusal motion that they were unaware that Justice Pittman had become a member of the Supreme Court, stating:
In sum, the appellees knew, or should have known, about Justice Pittman's membership on this Court when they filed their brief. Assuming arguendo that the appellees did not know, then certainly they must have acquired this information sometime after they had filed their brief and prior to the final disposition of this case. The appellees had ample opportunity to show good faith and apprise this Court of information which might have led to Justice Pittman's recusal; instead, they decided to "rest on their oars" until after this Court rendered its judgment. (citation omitted)
580 So.2d at 1175.
The present case, however, is not completely analogous to the Ryals case. Presumably, the fact that Harrell represented chancellor Bridges in his 1985 divorce action is contained in the public records; however, that is not the type of knowledge we can agree to hold a lawyer to have constructively possessed. To do so would require lawyers in every action to sift through the public records to discover any possible evidence of a judge's impropriety, or, cause their client to suffer a denial of due process because they will be held to have known of the impropriety, and will be barred from later raising the issue. Lawyers are certainly not encouraged *75 to await an outcome in their client's case prior to moving for a recusal. In circumstances where the impropriety is more readily apparent to the lawyers involved in the case, we may reach a different result. It must be remembered, however, that it is the judge who must come forth and recuse himself so as to avoid any appearance of impropriety. Jenkins, 570 So.2d at 1192.
We might also reach a different conclusion if chancellor Bridges had given the parties an opportunity to object or consent to him sitting on the case. We recently addressed the issue of parties waiving their objections to judicial recusal in Banana v. State, 635 So.2d 851 (Miss. 1994), wherein we acknowledged that
[i]n Mississippi, disqualification of a judge is both constitutional and statutory. Section 165 of the Mississippi Constitution of 1890 requires a judge to disqualify himself `where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties.' Mississippi Code, in addition to requiring disqualification for relation of the judge by affinity or consanguinity, requires disqualification where the judge may have been of counsel.
Id. at 853 (quoting Jenkins, 570 So.2d at 1192) (emphasis added). In Banana, the defendant was given the opportunity to object to the judge sitting on his case, and after conferring with counsel, specifically waived any objections. We then held that he had indeed waived the recusal issue for purposes of his appeal. The defendants were not given such an opportunity in this case.
We conclude that an objective observer would harbor doubts in this situation about Judge Bridges' impartiality. Frierson v. State, 606 So.2d 604 (Miss. 1992); Jenkins, 542 So.2d at 1181. Finally, Ms. Berry's argument that one of the defense lawyers (John McLaurin) was also somewhat involved in Judge Bridges' campaign is of little consequence. First, based on Judge Clapp's statement, and the newspaper article submitted by defendants, it is apparent that McLaurin's involvement was not as extensive as Harrell's. Even if it were, that fact does not serve to balance the scales on the question of the appearance of impropriety; rather, it may very well lead one to objectively conclude that Judge Bridges had even more reason to recuse himself.
This assignment has merit. Judge Bridges should have recused himself under the circumstances in this case.

IV.

WHETHER BURT YOUNG AND CITY OWED A DUTY TO MR. BERRY, AND IF SO, WHETHER THEY CAN BE HELD NEGLIGENT IN THIS CAUSE?
At the close of Ms. Berry's case, the chancellor granted Young and City's motion for directed verdict. After Ms. Berry reminded him of certain testimony, however, he reversed that decision. He did leave intact the dismissal of the punitive damages and the fraud claims against Young and City. Essentially, Young and City argue under this assignment that the chancellor committed error by not granting their motion for directed verdict.
Young and City argue that the record is devoid of any "credible evidence that Burt Young violated any legally recognized duty to the plaintiff." Relevant to this assignment is the fact that in Thomas v. State Farm Mutual Automobile Insurance Company, 796 F. Supp. 231 (S.D.Miss. 1992) (Judge Tom S. Lee), the district court held:
In addition to their claim for the $10,000.00 uninsured motorist benefits provided by the Joiner Buick policy, plaintiffs contend in count 2 of their complaint that the State Farm agent responsible for "selecting" automobile insurance coverage for the Joiners negligently failed to advise and provide guidance to Alma Joiner concerning her insurance "needs," which resulted in the issuance of a policy that provided inadequate coverage. They further urge that State Farm negligently and/or intentionally failed to adequately train its agents in the area of determining adequate policy limits and so advising its insureds.

*76 In other words, plaintiffs maintain that State Farm and its agents have a duty to recommend liability and uninsured motorist policy limits to applicants. No such cause of action exists in this state and there is absolutely no basis for predicting that such a cause of action would be recognized by the Mississippi Supreme Court.

Id. at 237. So, according to Judge Lee, who issued the opinion in Ms. Berry's district court lawsuit, no cause of action presently exists in Mississippi to allow a plaintiff to recover against a defendant insurance agency or individual agent for failing to recommend UM policy limits to applicants  which is precisely the main allegation against Young and City in this case. It is important to note, however, that while Judge Lee's holding in this regard may be regarded as persuasive, it is not binding on this Court. Judge Lee even indicated that it is this Court's province to recognize such a cause of action. Id.
Miss. Code Ann. § 83-11-101, in pertinent part, provides:
(1) No automobile liability insurance policy or contract shall be issued or delivered after January 1, 1967, unless it contains an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law, as amended, under provisions approved by the commissioner of insurance; however, at the option of the insured, the uninsured motorist limits may be increased to limits not to exceed those provided in the policy of bodily injury liability insurance of the insured or such lesser limits as the insured elects to carry over the minimum requirement set forth by this section. The coverage herein required shall not be applicable where any insured named in the policy shall reject the coverage in writing and provided further, that unless the named insured requests such coverage in writing, such coverage need not be provided in any renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer.
Miss. Code Ann. § 63-15-31, Motor Vehicle Safety-Responsibility, Payments sufficient to satisfy judgments, provides:
Judgments referred to in this chapter shall, for the purpose of this chapter only, be deemed satisfied:
(a) When ten thousand dollars ($10,000.00) has been credited upon any judgment or judgments rendered in excess of that amount because of bodily injury to or death of one (1) person as the result of any one (1) accident... .
It is clear, as Judge Lee found, that the minimum statutory amount any insurance policy must provide for in UM coverage, unless the named insured rejects UM coverage in writing, is $10,000.00.
We hold that in order for an insured to have an option to increase UM limits not to exceed the limits of the policy, or for the insured to completely reject UM coverage in writing, an insurance agent has a duty to explain UM coverage as outlined above. An agent is not necessarily under a duty to recommend that the insured exercise the option of obtaining UM coverage up to the limits of the policy; however, before an insured may make an intelligent decision about how much UM coverage he wants, or make a knowing waiver of UM coverage in writing (which the agent must obtain if there is to be no UM coverage under the policy), he must understand what he is entitled to. If an agent fails to uphold this duty to explain, and is thereby found to be negligent, damages should not be awarded in an amount less than the statutory minimum for UM coverage, $10,000.00, nor in an amount more that the limits of the particular policy in question  i.e., no more than the insured could have opted for under the terms of the policy.
Burt Young did admit to several things on the record that are relevant to a determination of his negligence. He stated that although he normally recommended his insureds place their names on the corporate policy, he did not recommend or explain to Mr. Berry that option. He said that he and *77 Mr. Berry never discussed, and he never considered Mr. Berry's need for, UM coverage. He also said that although he thought the coverage being given to Mr. Berry under the policy was deficient, he never encouraged Mr. Berry to obtain additional coverage.
As to the concern about placing Mr. Berry's name on the garage liability policy, it is apparent that the garage liability policy only covered owned automobiles. It was the DOC endorsement that could have potentially covered Mr. Berry for the accident in which he died  while occupying a vehicle not owned by Berry Pontiac. Even though Aetna representatives testified on cross-examination that placing Mr. Berry's name on the garage policy would have given him greater coverage under the policy, the extra coverage, if any, would still have only been for accidents occurring while Mr. Berry occupied a Berry Pontiac car.
Moreover, Young testified that the reason he did not make the suggestions to Mr. Berry was that Mr. Berry essentially cut him off and told him to provide the same coverage as Faust-Arrington or he would find another agent who could. This testimony could not be contradicted because Young testified that he and the deceased were the only parties to the conversation. Whether or not Mr. Berry made that statement to Young is a credibility call  one for the chancellor on remand.
Ms. Berry admitted in her testimony that the Berrys requested "full coverage," which in her opinion meant coverage for any liability that might arise, and that they be taken care of just as well as they had been taken care of by Faust-Arrington. Ms. Berry does not even attempt to combat in her brief the defendants' assertion that the Aetna policy provided more coverage than the prior Faust-Arrington policy.
It must be noted that normally the liability of an insurance agent/agency would be imputed to the company that issued the insurance policy, in this case Aetna, but that here, because of the res judicata bar against relitigating against Aetna, the insurance company itself cannot be held liable.
The petition for rehearing is denied.
REVERSED AND RENDERED IN PART; REMANDED IN PART TO THE RANKIN COUNTY CIRCUIT COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
PRATHER, P.J., and PITTMAN, JAMES L. ROBERTS, Jr. and MILLS, JJ., concur.
BANKS, J., concurs in part and dissents in part with separate written opinion joined in part by PRATHER, P.J.
SMITH, J., dissents with separate written opinion joined in part by BANKS, J.
DAN M. LEE, C.J., and McRAE, J., not participating.
BANKS, Justice, concurring in part and dissenting in part:
I join Justice Smith in his dissent with regard to the disposition of the claim against Aetna on grounds of res judicata. I write separately to add a few thoughts on the recusal issue.
Not much has been written concerning prior representation of the judge by a lawyer as a ground for recusal. The two leading cases are Smith v. Sikorsky Aircraft, 420 F.Supp 661 (C.D.Cal. 1976) and Potashnick v. Port City Construction Co., 609 F.2d 1101 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). These cases are distinguishable from the case at bar.
In Smith, the judge concluded, sua sponte, that his impartiality `might reasonably be questioned' where one of the party associated an attorney who had represented the judge in a personal matter some ten years before and in a mandamus action against the judge some five years before. No more about the relationship is discussed. For example, it is unclear whether the judge considered that attorney as his personal lawyer, with an ongoing relationship. The opinion of one judge as to what he should do under a particular set of circumstances may be colored by subjective or other considerations not readily apparent. Accordingly, Judge Hauk's decision with respect to the matter then before him has little persuasive value for me.
*78 In Potashnick, the judge not only had a continuing business relationship with plaintiff's lawyer, his former partner, but the judge's father was a senior partner in the law firm. The circuit court observed that the judge's father stood to gain financially from the case under consideration.
In another more recent case involving not prior but current representation, a Florida appellate court commanded recusal where the trial judge and her husband were represented by a firm involved in litigation before the judge. Atkinson Dredging Company v. Henning, 631 So.2d 1129 (Fla.App. 1994). The Atkinson Court relied upon Smith and Potashnick and made reference to Zoline v. Telluride Lodge Association, 732 P.2d 635 (Col. 1987) and In re Fiftieth District Court Judge, 193 Mich. App. 209, 483 N.W.2d 676 (1992). While a business relationship with a law firm was an issue in Zoline the court did not reach that. It held that the judge had to recuse because he was the controlling stockholder in the bank in which a party was a substantial customer. 732 P.2d at 640. The Michigan court required recusal where the judge held joint ownership of the building in which the firm was housed and the firm paid the property taxes and the mortgage for which the judge was jointly liable. 483 N.W.2d at 679.
On the other hand, no grounds for recusal were found in In re: Snowshoe Co., 137 Bankr. 619 (D.C.N.D.Va. 1991), where the judge had been previously represented by the law firm and perhaps, unbeknownst to the judge, it still represented him, along with a number of other judges and lawyers as co-defendants, on the appeal of the matter. In In re Beard, 811 F.2d 818, 831 (4th Cir.1987) the court observed concerning representation of a judge two years past that:
[w]e think the past representation by [the firm] should not disqualify [the judge]. That firm is involved in no contested matter in the Chapter 11 proceeding; petitioners' speculation that may change in the future is insufficient to require disqualification, as is the fact that the law firm has a claim against the company for past services rendered which does not place the firm in any different position than any other creditor in the same situation. Should the law firm be made a party to the proceeding or should its claim be affected, those are matters for another day. The outcome of the bankruptcy case or proceedings therein have no effect on [the judge's] affairs because of his past relation with [the firm] and it is not reasonable to believe his impartiality would be questioned on that account.
811 F.2d at 831-832.
Here, there is no suggestion that Judge Bridges had a continuing client relationship with Harrell. Nor is there a suggestion that he has a business relationship or any other real or potential financial interest in this case. The important question to be answered by this Court is whether a judge must recuse whenever a lawyer appears who has on some occasion in the past represented the judge. Is this forever? If three years is not a long enough period of repose, is five or ten? Are there limits regarding the nature of the representation? Do loan closings count? Must there be a court appearance? Do mandamus proceedings against the judge qua judge count? If recusal is not required in all instances of a prior lawyer-client relationship, what is there about this representation that dictates recusal?
In my view, where there is no continuing relationship and there has been a suitable period of repose, the prior representation of the judge by an attorney, at least in matters dissimilar to those under consideration, should not dictate recusal on the basis of an appearance of impropriety. We have not always demanded that jurors not have a prior relationship with a lawyer as long as the relationship is not ongoing and the juror attests to the ability to be fair and impartial. Dennis v. State, 555 So.2d 679, 681-682 (Miss. 1989); Henry v. Pearson, 253 Miss. 62, 78-79, 158 So.2d 695 (1963), reversed on other grounds, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965). Appellants' reliance on Holmes v. Elliott, for the contrary proposition is misplaced. There the jurors had "some employment or close friendship ties with counsel." Holmes v. Elliott, 443 So.2d 825 (Miss. 1983). I would not hold that Judge Bridges erred in failing to recuse himself *79 solely on the basis of Harrell's prior representation.
The other ground given for recusal is that Harrell was involved in the judge's campaign. Thirty-seven states have judges elected in some manner. Recusal for involvement in a judge's campaign has rarely been found to be required. In fact, the writer has found no case in which recusal was required solely for campaign activity other than where there was substantial involvement with a campaign then underway. See, Caleffe v. Vitale, 488 So.2d 627 (Fla.App. 1986) (Ongoing campaign, judge disqualified.); Barber v. MacKenzie, 562 So.2d 755 (Fla.App. 1990) (Recusal required where lawyers were on an ongoing campaign committee). But see, Rocha v. Ahmad, 662 S.W.2d 77 later proceeding 676 S.W.2d 149 (Tex. App. 1983) (Recusal not required for reason that lawyers involved had contributed "many thousands" of dollars to the judges' campaigns.); Keane v. Andrews, 555 So.2d 940 (Fla.App. 1990) (Recusal not required because of financial contribution to judge's campaign.); Gluth Bros. Constr. Inc. v. Union Nat. Bank, 192 Ill. App.3d 649, 139 Ill.Dec. 650, 548 N.E.2d 1364 appl. den. 131 Ill.2d 559, 142 Ill.Dec. 881, 553 N.E.2d 395 (1989) (Counsel's service as campaign manager six years before not grounds for recusal of judge.); Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003 (1989) (Attorney's service as co-chairman of campaign in past insufficient grounds for recusal).
Here, Harrell's alleged involvement as a spokesman for the campaign occurred during the decisional period of the matter under consideration. As in Jenkins v. Forrest County General Hospital, 542 So.2d 1180 (Miss. 1988), then, there is a confluence of factors bearing on recusal. Not only was there the past representation but a current ongoing relationship with a campaign. To be sure, as would be expected in any single county judicial election in this state almost, if not all, lawyers of political prominence would be involved in some manner in a judicial election. The fact that John McLaurin, who represented Aetna, was also involved in Judge Bridges' campaign is evidence of this fact and might ordinarily be somewhat ameliorative. That is not enough, however, especially so, in light of the most unusual and suggestive inquiry to McLaurin as to whether he "cared" about the case.
Where, as here, a campaign spokesman is involved in litigation promising a substantial contingent fee, where the same lawyer has represented the judge in the not too distant past, and where the judge is the sole finder of fact as well as the initial arbiter of the law vested with considerable discretion in evidentiary matters, we are compelled to draw the line on recusal.
PRATHER, P.J., joins in part.
SMITH, Justice, dissenting:
The case sub judice arises from an unfortunate automobile accident on November 14, 1981 which was indisputably caused by the negligence of Willie B. Davis, an uninsured, drunk driver, subsequently convicted of manslaughter and sentenced to serve a term of fifteen years in the custody of the Mississippi Department of Corrections. Jack Berry was killed and his wife, Cherry Berry, was severely injured.
Jack Berry had recently changed his insurance coverage to Aetna through the solicitations of Burt Young, an Aetna agent. Young had attempted for over ten years to solicit Berry's insurance business, but was not successful until the death of Berry's previous agent. Normal industry standards and Aetna guidelines required that Young include the name of Jack Berry along with Berry's Pontiac dealership as a primary insured under the policy because Berry owned more than 50% of the stock of the dealership. This procedure would have given Berry full coverage under the policy with no additional cost involved. Young claimed he normally followed this procedure with all of his clients, but did not do so in Berry's case. Instead, he sold Berry a separate endorsement, a drive-other-car (DOC) endorsement, which interestingly required an additional premium but would provide the same coverage. The endorsement, in violation of state law, failed to itemize a premium for uninsured motorist (UM) coverage. Aetna ultimately determined the endorsement did not include uninsured motorist coverage. Young admitted *80 that at the time he wrote the endorsement, he knew Berry could have been personally insured at no additional cost and that Berry's coverage was inadequate, but testified he did not advise Berry of his need for personal UM coverage. Why would Young have singled out Jack Berry, a client to whom Young ultimately sold thirty-six (36) insurance policies, to deviate from Aetna's normal procedure? Young had to be doing something right to acquire this much business from the Berrys. Why then did Young claim at trial that Berry cut him off, Berry telling Young that he simply wanted a duplication of the Faust-Arrington agency's previous policy? Was it the truth or was it to protect Young's own possible negligence since Berry was dead and Young thought that no one else could dispute what allegedly was discussed between the two men? The chancellor was obviously concerned with such conduct and so is this dissenter.
Cherry Berry refuted Young's claim at trial, maintaining that she was present during the insurance consultations between Young and Jack Berry and that Berry requested full coverage. Ms. Berry also testified that Young never explained uninsured motorist coverage to them, nor were they given the opportunity to reject uninsured motorist coverage for the DOC endorsement. It could be that the chancellor saw through this situation as an additional premium allowing Young an additional commission or he did not put much credibility, if any, in Young's testimony.
What is very clear from this record is that Ms. Berry did not discover and could not have discovered the error or omission in the policy prior to the date of the accident. The error would only have been discoverable by Ms. Berry on November 6, 1984 when Aetna disclosed for the first time its basis for denial of coverage. Ms. Berry's inability to discover the error is also not astounding at all in view of the additional fact that Aetna itself, did not discover the error in coverage for more than three years after Jack Berry's death.
This case is a classic example of one insurance company trying to shift its obligations under contract theory to another insurance company who had no contractual obligation to the claimant. Aetna first determined that it had responsibility towards Ms. Berry, then reversed its position, contending it was only responsible in "excess" of the Royal Globe policy issued to General Motors.
The majority writes that res judicata applies. I disagree. Uninsured motorist coverage is in a special category unto itself. It is not ordinary direct insurance, but rather a hybrid of both direct and liability coverage. Contrary to other policies and endorsements, the legal liability of a third party controls the amount of an uninsured motorist claim. Rampy v. State Farm Mut. Auto. Ins. Co., 278 So.2d 428 (Miss. 1973). This is generally determined by a direct action lawsuit against an individual's own carrier, as was the situation in Ms. Berry's federal action against Aetna.
Aetna's motion for summary judgment was Ms. Berry's first notice of the error in the policy. Prior to that time, everyone dealing with the Berry claim at Aetna never denied that coverage existed requiring payment. This dissenter would assert that it was only after this Court's decision in Government Employees Insurance Co. v. Brown, 446 So.2d 1002 (Miss. 1984), that Aetna changed its position. In Government Employees Insurance Co., the Court held that stacking of uninsured motorist coverage under one insurance policy containing separate premiums shall be permitted up to the number of separate premiums charged. Id. at 1006. Berry calculated that the policy was going to stack thirty-seven (37) times which would equate to coverage in the amount of $925,000. Aetna's timing in promptly seeking a basis to deny coverage is suspect. Aetna's own misconduct should prohibit their claim of res judicata on an issue which never arose in the federal litigation.
The federal district court was not convinced that Aetna proved prior litigation of all issues. As the majority points out, "it is noteworthy that the district court had difficulty determining exactly what claims Ms. Berry was advancing in the chancery court action, and furthermore expressed hope that Aetna's position on the res judicata and collateral estoppel issues would ultimately be *81 vindicated in the state courts." Majority Opinion at 60. Although Berry filed a Motion For Leave to File Amended Complaint in the district court, the motion was never ruled on by that court. Royal Globe filed a response to Berry's summary judgment motion claiming that Berry had not effectively raised a bad faith claim. Accordingly, Berry technically never asserted a bad faith claim against Aetna in the federal district court action.
Berry cites Schmueser v. Burkburnett Bank, 937 F.2d 1025, 1031 (5th Cir.1991), for her argument against Aetna's res judicata claim. Schmueser interprets Texas law which is practically identical to Mississippi law on res judicata. The Schmueser decision held that a lawsuit involves a different cause of action "when the theories of recovery, the operative facts, and the measure of recovery differ." Id. at 1031. In Schmueser, the 5th Circuit held:
The Schmuesers, in the state court declaratory judgment action asserted a different cause of action than that which they later raised in federal court. The actions differ in their respective theories of recovery  the state court action sounding in contract, the federal court action sounding in tort. Additionally, the two actions differ in their operative facts. The state court action required nothing more than a showing that the conditions contained in the letter of credit were satisfied, yet the Bank refused to pay. The breach of a duty of good faith claim asserted in federal court on the other hand, required proof that the Bank engaged in unfair or dishonest conduct involving the letter of credit. See, Tex. bus. & Com.Code Ann. § 1.201(19) (Vernon 1986). Finally, the two actions differ in their measure of recovery. The declaratory judgment actions simply declared the Bank's liability to the Schmuesers under the terms of the letter of credit. But in the breach of a duty of good faith claim the Schmuesers prayed for damages caused by the Bank's breach which were neither sought nor awarded in the declaratory judgment action. Thus, the Schmuesers' actions for declaratory judgment and breach of duty of good faith constitute "different causes of action" under the Texas doctrine of res judicata. Accordingly, the District court was correct in holding that their claim for breach of a duty of good faith was not barred.
Schmueser at 1031.
The general rule, when this Court reverses and remands for a new trial, the case is to be tried de novo on all issues. However, there is an exception to the general rule. This Court, in Weems v. American Security Insurance Co., 486 So.2d 1222 (Miss. 1986), held:
There is an obvious exception to this general rule. Where the judgment on the issue not assigned is one which can rationally co-exist with the appellate reversal on the issue which is assigned as error, the judgment on the issue not assigned ordinarily remains final. Cf. Statham v. Blaine, 234 Miss. 649, 670, 108 So.2d 213 (1959). Within this exception is Mrs. Weems bad faith/punitive damages claim which we regard as a claim separate and independent of her claim on the insurance contract. The reason why Mrs. Weems' bad faith claim lies within the exception is that it proceeds on a theory of liability factually and legally distinct from her contract claim. This becomes apparent when it is remembered that a bad faith refusal claim is an "independent tort," State Farm Fire and Casualty Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985); Standard Life Insurance Company of Indiana v. Veal, 354 So.2d 239, 247 (Miss. 1977).
For today's purposes, the point is that the bad faith/punitive damages claim is one separable in law and in fact from the contract claim asserted by an insured under the terms of the policy. This separability exists both with respect to the liability and damages features of the contract claim vis-a-vis the bad faith refusal claim.
Weems at 1226.
The Tenth Circuit Court of Appeals in McCarty v. First of Georgia Insurance Co., 713 F.2d 609, 612 (10th Cir.1983), held that an action on an insurance policy, resulting in a judgment against the insured, did not bar a subsequent action by the insured against the same insurer for bad faith. The court stated:

*82 Res judicata, however, does not shield a blameworthy defendant from the consequences of his own misconduct. The rule against splitting causes of action serves no purpose if a plaintiff cannot reasonably be expected to include all claims in the first action.
McCarty at 612.
The Restatement (Second) of Judgments § 26 Comment j (1982), states:
A defendant cannot justly object to being sued on a part or phase of a claim that the plaintiff failed to include in an earlier action because of the defendant's own fraud.
... . The result is the same when the defendant was not fraudulent, but by an innocent misrepresentation prevented the plaintiff from including the entire claim in the original action.
Returning to the case at bar, it is clear that Ms. Berry's action focused on the theory that Jack Berry was entitled to uninsured motorist coverage under the Aetna policy. The federal action was sounding in contract, the case sub judice is sounding in tort, two totally separate and different causes of action. Res judicata should not serve as a shield for Aetna from its own bad faith. This Court should not allow Ms. Berry's claim for breach of a duty of good faith to be barred by res judicata.
Regarding the Med-Pay claim, Ms. Berry never raised a claim under the medical payment provision of the policy in the federal cause of action. Neither was there a ruling by the federal court regarding Ms. Berry's claim of medical payment benefits.
The majority's reliance on Smith v. Safeco Ins. Co., 863 F.2d 403 (5th Cir.1989), is misplaced. In Safeco, the insured brought a claim for Med-Pay benefits which was denied, then sued again for those benefits. After the first suit was resolved, the insured filed a new cause of action for uninsured motorist benefits, which was deemed barred by res judicata by the court.
This Court should not adopt the Safeco decision as applicable to this case. The result reached in Safeco should not be required where the uninsured motorist claim is presented first, as was done in the case sub judice. As previously noted, uninsured motorist benefits is a hybrid. Adoption of the Safeco result would force insureds to assert, prematurely or unnecessarily within the uninsured motorist cause of action, claims for medical payment, collision and other types of coverage. The majority opinion deprives Ms. Berry of medical pay benefits under the policy to which she is entitled.
This case reeks of injustice by Aetna towards Ms. Berry. Aetna initially admitted liability in the federal suit, but promptly changed positions to denial of coverage after the Government Employees Insurance Co. decision. Ms. Berry clearly thought Aetna was admitting coverage for UM benefits until December 6, 1984. Aetna's claims supervisor admitted during testimony that such date was "the very first time that Aetna ever brought to the plaintiff's attention that they were in any way denying coverage" on Ms. Berry's claim. Aetna delayed payment under the policy while it appealed to the Fifth Circuit Court of Appeals. Aetna admitted through its counsel that the underwriting file on the Berry claim had been destroyed, but claimed it could be resurrected from the claims file. The file was never resurrected. The chancellor correctly found that Aetna was guilty of spoliation of evidence in Berry's case relating to accounting and underwriting, its claims file and refund audit.
Aetna could not produce a contemporary audit or other records to show how and why Aetna refunded $308.00 in premiums for the 1980-81 policy. The refund in question was made to Ms. Berry on February 9, 1982, after she made her claim under the policy. Subsequently, Aetna denied coverage for the lack of a $10.00 premium because the premium was shown on the drive-other-car endorsement. This is true even though Aetna had in its possession more than sufficient funds to cover the premium, a fact which Aetna, at trial, could not explain to the chancellor. This factor is astonishing because Aetna claimed that it did not have the authority to apply the excess premium to cover the supposed missing uninsured motorist premium of $10.00, a position Aetna's witnesses never explained or supported at trial. Aetna's representative Keith Bayless, testified *83 that Aetna issued the garage policy without an application in violation of its own guidelines. Agent Young, at trial, did produce an application from his own personal files. It is little wonder that the chancellor was concerned with this situation.
Finally, if the aforementioned facts do not raise sufficient "red flags" of warning concerning Aetna's handling of Ms. Berry's claim, Aetna's counsel disputed that a firm offer to Ms. Berry had ever been made, as did Aetna's claims supervisor. This entire scenario is sufficiently demonstrative of Aetna and Young's patently deficient and questionable handling of Ms. Berry's claim. We contribute to the injustice by reversal. I would affirm the chancellor.
I respectfully dissent.
BANKS, J., joins this opinion in part.