# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00953-SCT

*LINDA OWENS*

*v.*

*MISSISSIPPI FARM BUREAU CASUALTY
INSURANCE COMPANY, MISSISSIPPI FARM
BUREAU MUTUAL INSURANCE COMPANY AND
FARMERS INSURANCE EXCHANGE*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/10/2002 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PHILIP B. TERNEY |
| ATTORNEYS FOR APPELLEES: | GERALD H. JACKS |
| | KATHY R. CLARK |
| | STEVEN CAVITT COOKSTON |
| | MARC A. BIGGERS |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 09/15/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This case involves a Mississippi automobile accident and a guest passenger's claim for benefits under the uninsured motorist provisions of two insurance policies, the driver's insurance policy written in Tennessee, and the guest passenger's own policy written in Mississippi.    The issues presented are (1) whether Tennessee or Mississippi law will apply to the claim under the Tennessee policy, and (2) whether the guest passenger's insurance agent provided sufficient information and advice concerning uninsured motorist coverage.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

¶2. On May 24, 1998, Linda Owens was injured in an automobile accident in Mississippi while riding as a guest passenger in a vehicle owned and driven by Tennessee resident Ruth Saed. The accident was caused by the negligence of Hubert Branch. Mrs. Owens suffered extensive injuries and incurred medical bills in the range of $90,000.

¶3. At the time of the accident, Branch had $20,071 in liability coverage and therefore was an under insured/uninsured motorist. Saed.'s automobile insurance policy was written in Tennessee by Farmers Insurance Exchange, and provided $100,000 of uninsured/under insured motorists coverage, and $5,000 in medical coverage, for the named insured and guest passengers.

¶4. Mrs. Owens was an insured under an automobile policy purchased by her husband, Ralph, from Mississippi Farm Bureau Casualty Insurance Company. The Farm Bureau policy covered five vehicles, and included $300,000 of bodily injury liability coverage, $50,000 in UM coverage, and $15,000 in medical coverage, for each of the five insured vehicles. Thus, under her own policy, Mrs. Owens had $250,000 in UM coverage and $75,000 in medical coverage. Additionally, Mrs. Owens was covered by a Farm Bureau umbrella policy issued to Mr. Owens. Although the umbrella policy provided $2 Million in liability coverage, it had no UM coverage because of a waiver signed by Mr. Owens.

¶5. Branch's liability carrier paid its policy limits of $20,071. Three months after the accident, Mrs. Owens notified Farm Bureau of the accident and requested assistance with her medical bills. Farm Bureau began making medical payments and continued to do so for a year, at which time the medical bills totaled more than $60,000. Farm Bureau continued to make

2

medical payments under its UM coverage, in addition to $1,288 in disability payments due under the policy.

¶6.     On August 18, 2000, Mrs. Owens's attorney notified Farm Bureau that Mrs. Owens was ready to settle her UM claim.   Upon determining that Mrs. Owens's claim would "arguably" exceed its policy limits, Farm Bureau tendered the balance of its UM coverage in the amount of $232,088.23.   The check was returned to Farm Bureau by Mrs. Owens's counsel, who informed Farm Bureau that his "client was not ready to receive those funds. . . ."   The funds were thereafter paid by Farm Bureau and received by Mrs. Owens with agreement of her counsel.

¶7.     In the meantime, Mrs. Owens had pursued a claim for UM benefits from Farmers, asserting that she was entitled to UM benefits because she was a guest passenger in its insured's vehicle at the time of the accident.   Mrs. Owens admits that Farmers timely paid its $5,000 medical benefit, but claims that Farmers ignored her claim for UM benefits for months, thereby acting in bad faith.   Farmers ultimately paid Owens all of its available UM policy limits of $79,929.00.[1]

¶8.     On November 20, 2000, Linda Owens sued Farmers and Farm Bureau, alleging that both Farm Bureau and Farmers negligently and in bad faith failed to investigate, evaluate and pay her claim within a reasonable time and that Farm Bureau's agent had failed to adequately explain UM coverage to her husband, which resulted in her economic loss because she was not insured with the maximum UM coverage available.

---

[1]Farmers paid $79,929.00 in UM coverage after claiming its set-off of $20,071.00 paid by Branch's carrier.

¶9.     Trial commenced, and at the conclusion of Owens's case, Farmers moved for a directed verdict, asserting that, under Tennessee law, Owens had not established that she was entitled to UM coverage.  The circuit judge agreed, concluding that Tennessee law applied to Owens's claim against Farmers, and that Farmers was entitled to a directed a verdict.

¶10.    The case was submitted to the jury on Mrs. Owens's two claims against Farm Bureau. The jury returned a verdict in favor of Farm Bureau on both issues, and judgment was entered accordingly.  Mrs. Owens now appeals both the directed verdict and the jury verdict to this Court.

## ANALYSIS

### I.    Directed Verdict in Favor of Farmers

¶11.    This Court reviews directed verdicts de novo.  *Skrmetta v. Bayview Yacht Club*, *Inc*. 806 So. 2d 1120, 1124 (Miss. 2002) (citing *Morgan v. Greenwaldt*, 786 So.2d 1037, 1041 (Miss. 2001)).

¶12.    We begin by observing that Mrs. Owens advances no argument or resistance to Farmers' position that, under Tennessee law, no UM benefits would be payable.  Rather, she asserts that Mississippi law should apply and that she should have been allowed to present her bad faith claim under Mississippi law to the jury.

¶13.    Similarly, Farmers makes no argument and presents no authority which leads us to believe that it would take the position that should this case be decided under Mississippi law, Mrs. Owens should have been allowed to present her case to the jury.  Thus, we are grateful that the parties' respective positions do not require us to analyze the consequences of liability under the law of each state, but only require us to analyze which law is applicable.

4

¶14.   Thus, these respective positions leave us with but one issue to address as to Farmers, that is, whether Tennessee or Mississippi law applies.   If Tennessee law applies, we must affirm the directed verdict in favor of Farmers.   If Mississippi law applies, we must reverse and remand for a new trial.

*Boardman v. U.S.A.A.*

¶15.   In 1985, this Court responded to a Supreme Court Rule 46[2] certification from the United States Court of Appeals for the Fifth Circuit concerning the choice of laws to be applied in a case involving a UM claim.   In ***Boardman v. United Services Auto. Ass'n***, 470 So. 2d 1024 (Miss. 1985), USAA issued an automobile liability insurance policy to Henry Boardman, a resident of Nebraska.   ***Id***. at 1028.   The policy covered three automobiles all principally garaged in Nebraska.   ***Id***.   Henry's son, Joseph, who was an insured under the USAA policy, traveled from Nebraska to Mississippi to attend Mississippi State University, and to work for his uncle in Gulfport.   ***Id***.   While in Gulfport, and not in one of the vehicles insured under Henry's policy, Joseph was involved in an automobile accident with an uninsured motorist.   ***Id***. at 1029.   Henry's USAA policy contained an exclusion for "bodily injury to an insured while occupying an automobile (other than an insured automobile) owned by the named insured or a relative. . . ."   ***Id***.   Thus, because Joseph was in an owned vehicle not insured by USAA when he was injured by an uninsured motorist, USAA asserted that its exclusion applied and no benefits were payable.   ***Id***.   Joseph, on the other hand, asserted that Mississippi law

---

[2]Supreme Court Rule 46 has been re-codified at Rule 20, Mississippi Rules of Appellate Procedure.

should be applied and that such exclusions are prohibited. *Id*. *See Lowery v. State Farm Mut. Auto. Ins. Co*., 285 So. 2d 767, 777-78 (Miss. 1973).

¶16.    This Court analyzed the facts under Sections 6, 188, and 193, Restatement (Second) of Conflicts of Laws (1971), and held that Nebraska law should be applied.   The Section 6 analysis, also called the modified *Craig-Mitchell*[3] center of gravity test, was "superficially easy." 470 So. 2d at 1032.  The Court pointed out that

> The contract in question was made and entered into in the state of Nebraska. Henry Boardman at the time was a resident of Nebraska and at all times relevant hereto all insureds under the contract have been residents of Nebraska.  The policy covered three automobiles each of which . . . was "principally garaged in Nebraska."  The principal location of the risks insured against was in Nebraska. Mississippi's contacts with this contract and the parties are fortuitous, arising from the fact that Joseph Boardman took a summer job in Gulfpot.  All of this suggests that Nebraska law should apply.

*Id*.

¶17.    In discussing Section 188, which the Court found "narrows the focus of §6" in general contract actions, the Court looked at such factors as the place of contracting, negotiating, and performing the contract, the location of the subject matter, and the domicile of the parties. The Section 188 analysis was consistent with the Section 6 analysis.   Finally, in discussing Section 193, which was specifically held to be "applicable in this state," the Court focused on the "principal location of the risk."   All of these factors led the *Boardman* Court to hold that Nebraska law would apply. *Id*. at 1033.

---

[3]See *Mitchell v. Craft*, 211 So. 2d 509, 512 (Miss. 1968); *Craig v. Columbus Compress & Warehouse Co*., 210 So. 2d 645, 649 (Miss. 1968).

¶18. Mrs. Owens distinguishes **Boardman** from the facts of her case by pointing out that she was a Mississippi resident, whereas Joseph Boardman was a resident of Nebraska. She claims that her residency, together with Mississippi's "strong public policy in favor of full uninsured motorist coverage" are the most important factors for us to consider in deciding which state's laws to apply in this case.

*Public policy*

¶19. Mrs. Owens submits that this Court has recognized a strong public policy in Mississippi favoring full UM coverage in *United States Fidelity & Guaranty Co. v. Ferguson*, 698 So. 2d 77 (Miss. 1997) and *McDaniel v. Shaklee*, *U.S. Inc.,* 807 So. 2d 393 (Miss. 2001). However, contrary to Mrs. Owens's assertions, this Court's decisions in *Ferguson* and *Shaklee* address Mississippi's public policy in favor of stacking UM policies, and this Court's "intolerance of the insurance industry . . . rewriting its policies to circumvent the Court's decisions." *Shaklee*, 807 So. 2d at 397 (citation omitted). There is no stacking issue here. Mrs. Owens cites no language from these decisions which addresses choice of law analysis or principles.

*Residency*

¶20. As support for her position concerning the importance of residency, Mrs. Owens cites *O'Rourke v. Colonial Insurance Co. of California*, 624 So. 2d 84 (Miss. 1993), for the proposition that the center of gravity test has never been applied where the claimant was a Mississippi resident. She further points to this Court's dictum in *Boardman*, "Had Joseph Boardman at the time of the accident been a citizen of Mississippi, we might perceive this matter altogether differently." *Boardman*, 470 So. 2d at 1035, n.6. Mrs. Owens misperceives

7

the importance of this statement to her case. Joseph Boardman was a named insured under the USAA policy. Therefore, if he were a Mississippi resident, that would necessarily mean that USAA issued a policy, at least in part, to a Mississippi resident. For an insurance company to intentionally include a resident of Mississippi as a named insured, is a far different issue from that presented here. Mrs. Owens was unknown to Farmers when the policy was written. Under the policy, all named insureds are residents of Tennessee. The fact that Mrs. Owens became a temporary insured because of her status as a guest passenger does not merit the same analysis as the fact scenario suggested in *Boardman*.

¶21. Farmers argues that the circuit court properly applied Mississippi's choice of law principles and properly determined that Tennessee law applied to Mrs. Owens's claim. Farmers submits that decisions applying Mississippi choice of law rules consistently place the greatest emphasis on the principal location of the risk and place of contracting in determining which state's law to apply to issues of insurance contract interpretation and construction. Farmers cites *Ford v. State Farm Ins. Co.*, 625 So. 2d 792 (Miss. 1993); *O'Rourke*, 624 So. 2d 84; and *Baites v. State Farm Mut. Auto. Ins. Co.*, 733 So. 2d 792 (Miss. Ct. App. 1998), as support for the trial court's determination that, under the center of gravity test, the only factor favoring application of Mississippi law was the fact that Mrs. Owens was a Mississippi resident, and in determining that no overriding Mississippi public policy existed which (1) overcame the reasonable expectation of the contracting parties that their respective rights would be determined with respect to Tennessee law or (2) compelled a finding that Tennessee law should not apply to the claim of a Mississippi resident under the facts of this case.

8

¶22.	Citing **Boardman**, **O'Rourke,** and **Baites**, Farmers argues that application of Tennessee law to Mrs. Owens's claim does not violate Mississippi public policy, and that Mississippi's public policy in favor of stacking, and against efforts to exclude cases and persons from coverage of uninsured provisions of policies, is not so strong as to override the reasonable expectations of parties that coverage questions will be governed by the law of the state where the contract is made. Farmers points out that its policy was issued in Tennessee to a Tennessee resident, and the parties had a reasonable expectation that Tennessee contract law would apply to the interpretation of the policy.

¶23.	In discussing its reasons for granting Farmers' motion for a directed verdict, the trial court conducted a balancing under the center of gravity test. The trial judge noted that the contract was made in Tennessee, the negotiations took place in Tennessee, and Sed. was a Tennessee resident. With respect to the place of performance of the contract , the trial court stated that "there seems to be no question that substantially the contract was to be performed in the state of Tennessee where the policy holder resided." The trial court further noted the location of subject matter of the contract was Tennessee, and the fact that the accident occurred in Mississippi should be given little, if any, weight. Finally, the trial court considered the domicile of the parties, including both the parties to the contract, who were both domiciled in Tennessee, as well as Mrs. Owens, whose domicile was Mississippi. Upon considering all of these factors, the trial court held:

> [T]he Court still must determine that the factors weigh in favor of Tennessee law. Let me come back and focus on my determination of the last factor or my consideration of the last factor, because it appears that this may be a case of first impression being that it clearly involves a Mississippi resident. The Court, again, taking guidance from the Supreme Court, that what we are trying to

9

determine is what the reasonable expectation of the parties of the contract would have been concerning the protection that is offered by the policy realizes that if this claim was being brought by Ruth Sed., there would be no question. In fact, this case would be on all fours with the O'Roark [sic] case and would come pretty close to Bordeman, [sic] and in that case there's no questions that Tennessee law would apply. When the Court substitutes a Mississippi insured instead of Ruth Sed., it cannot find on this issue of whether this policy can be stacked, which is the issue that we're looking at, as well as the issue of whether or not there was an expectation that Mississippi law would be able to be applied, that that distinction is not significant enough to outweigh the other factors in the balancing test required for the center of gravity. That then means - - moves the Court to whether or not there is an overriding Mississippi state policy concerning the issue involved here so that the Court would be compelled to ignore Tennessee law and apply the law of this forum.

The Supreme Court has made clear in O'Roark [sic] that the policy under the uninsured motorist law and in particular the policy - - public policy concerning stacking of policies is not so strong as to require the use of Mississippi law when a determination has been made that the center of gravity is in another jurisdiction.

Therefore, the Court finds that the provision in the Farmers policy concerning other insurance specifically which reads, (as read) "however, with respect to bodily injury sustained by an insured persons while occupying a vehicle not owned by that person, this coverage shall apply only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance must be given the enforcement that it would be given under Tennessee law." And that being a valid provision under Tennessee Law, the Court finds that it applies in this action. Therefore, on the defendant Farmers' motion for directed verdict, the Court finding no entitlement under this policy did not exceed the limits of the policies available through Farm Bureau directed verdict is granted.

¶24. The record demonstrates that the trial court was particularly careful to allow plaintiff's counsel time to read the relevant case law and the brief supporting Farmers' motion and to respond in oral arguments before the court. The trial court allowed extensive argument by the attorneys on the motion, and properly considered the various factors required under the center of gravity test.

10

*Waiver*

¶25.    Mrs. Owens asserts that the conflict of law question should not have been at issue in the trial court because it was not well pled by Farmers.  However, the record reflects that Farmers' supplemental responses to Mrs. Owens' First Set of Interrogatories asserted that Tennessee law controlled the assessment of her claim.  The choice of law issue was again raised by Farmers at the deposition of Mrs. Owens's expert John Kornegay, in a motion in limine, and in the Pretrial Order.  We find that Farmers clearly placed the issue of which state's law would apply before the trial court.

¶26.    We hold that the trial court correctly applied the center of gravity test in holding that Tennessee law controls the claims of Owens against Farmers.

## II.    Farm Bureau's handling of the claim, and the Trial Court's Denial of a J.N.O.V. or a New Trial

¶27.    At trial, Mrs. Owens claimed that Farm Bureau negligently handled her claim and failed to adequately explain UM coverage to Mr. Owens, as required by this Court's holding in *Aetna Casualty & Surety Co. v. Berry*, 669 So. 2d 56 (Miss. 1996).  These claims were submitted to the jury which rendered a verdict in favor of Farm Bureau.

¶28.    On appeal, Mrs. Owens does not specify what error she alleges the trial court committed with regard to her claims against Farm Bureau and the jury verdict in its favor.  In her "CONCLUSION" she states, "Farm Bureau's treatment of Appellant and her husband at trial is [sic] outrageous and should not be condoned by this Court."  We take this to be a claim that the jury verdict was the product of bias, passion or prejudice.  She also characterizes several positions taken by Farm Bureau as "ludicrous."  We interpret her language to be a claim that

11

the jury verdict was against the overwhelming weight of the evidence,[4] and the trial court should have granted her JNOV motion. A careful review of Mrs. Owens's brief unearths no other language which we are able to interpret as a possible assignment of error.

¶29. The standard of review for a denial of a JNOV and a denial of a directed verdict are the same. Under this standard, this Court must:

> consider the evidence in the light most favorable to the [non-moving party], giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the [moving party] that reasonable [jurors] could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*3M Co. v. Johnson*, 895 So.2d 151, 160 (Miss. 2005) (quoting *Munford, Inc. v. Fleming*, 597 So.2d 1282, 1284 (Miss. 1992)). Thus, viewing the evidence in the light most favorable to Farm Bureau, this Court must determine whether the facts are nevertheless so overwhelmingly in favor of Mrs. Owens that reasonable jurors could not have found in favor of Farm Bureau.

¶30. Additionally, "[t]his Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion." *Steele v. Inn of Vicksburg, Inc.*, 697 So.2d 373, 376 (Miss. 1997) (citing *Shields v. Easterling*, 676 So.2d 293, 298 (Miss. 1996)).

*Berry*

---

[4]The appropriate assignment of error for Mrs. Owens's claim would be that the trial court erroneously denied her motion for judgement notwithstanding the verdict. Although she does not make that claim in her "STATEMENT OF ISSUES," the language in her brief marginally meets her obligation to inform this Court of her assignments of error.

¶31. Mrs. Owens claims that Farm Bureau did not adequately explain uninsured motorist coverage to her husband when he purchased and renewed numerous automobile liability insurance policies over a nine-year period. Since the Owenses' automobile liability insurance policy had lower UM benefits than liability limits, Mrs. Owens claims that each time the policy was amended or changed to include as an additional named insured a new family member or new corporate entity, Farm Bureau had the obligation to obtain a new written waiver of UM benefits. Additionally, Mrs. Owens claims Farm Bureau's agent, Kelly Smith, failed to adequately explain UM coverage to Mr. Owens when he purchased the liability policy, and each time he renewed the coverage.

¶32. To support her claim, Mrs. Owens cites *Aetna Casualty & Surety Co. v. Berry*, 669 So. 2d 56 (Miss. 1996), where this Court stated,

> We hold that in order for an insured to have an option to increase UM limits not to exceed the limits of the policy, or for the insured to completely reject UM coverage in writing, an insurance agent has a duty to explain UM coverage as outlined above. An agent is not necessarily under a duty to *recommend* that the insured exercise the option of obtaining UM coverage up to the limits of the policy; however, before an insured may make an intelligent decision about how much UM coverage he wants, or make a knowing waiver of UM coverage in writing (which the agent must obtain if there is to be no UM coverage under the policy), he must understand what he is entitled to. If an agent fails to uphold this duty to explain, and is thereby found to be negligent, damages should not be awarded in an amount less than the statutory minimum for UM coverage, $10,000.00, nor in an amount more that the limits of the particular policy in question–i.e., no more than the insured could have opted for under the terms of the policy.

*Id*. at 76. The only member of the *Berry* Court remaining on this Court today is Chief Justice Smith, who dissented. Thus, it is worthwhile for us to reaffirm the duty of an insurance agent with regard to explaining UM options.

13

¶33. The agent's requirement announced in *Berry* is in two parts. The first requires explanation of UM coverage prior to obtaining the waiver required by Miss. Code Ann. § 83-11-101. The second requires explanation of an insured's right to increase UM benefits from the statutory limit to the liability limit of the policy.

¶34. Although we question the seemingly absolute requirement of explanation by the insurance agent, we fully agree and hold that the statutorily required waiver of UM coverage may be obtained only from a fully-informed insured. That is to say, the waiver must be knowing and intelligent. This distinction is important since there may be instances where the insured – separate and apart from any explanation by the agent – is already fully aware of the intricacies of UM coverage, including the costs and benefits, and being fully informed, chooses to waive UM coverage. Under such circumstances, no logical reason exists to require a redundant explanation from the agent. The simple principle announced here is that no statutorily-required waiver of UM benefits is effective unless the waiver was obtained from an insured who was reasonably knowledgeable and informed of the costs and benefits of such UM coverage prior to signing the waiver. To this extent, we reaffirm the holding in *Berry*.

¶35. However, we reject and overrule the implication in *Berry* that an insurance agent has the absolute, court-created duty to explain an insured's right to purchase additional UM coverage, over and above the amount of coverage required by statute. Under the statute, the only coverage required to be written, unless rejected by written waiver, is the "limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility

14

Law,[5] as amended. . . ." Miss. Code Ann. § 83-11-101(1). Thus, according to the statute, every automobile liability policy written in Mississippi provides UM coverage up to the MVSRL limit, regardless of what may or may not be written in the policy. The same cannot be said for optional coverage which exceeds that limit. Such optional coverage is not required by statute, and the statute contains no requirement of a waiver for an insured to reject the optional coverage. We reject the notion that this Court should bypass the Legislature and judicially create an obligation to obtain a knowing and intelligent waiver or rejection of optional coverage. The Legislature could easily have required every insurance policy to include such coverage, unless waived. However, it did not. Instead, it chose only to require such waiver of the MVSRL limit, and further it provided that additional coverage "at the option of the insured . . . may be increased." *Id*.

¶36. In the case before us today, there is no issue of knowing, intelligent waiver, since Mr. Owens did not waive the statutory minimum UM coverage. Rather, Mrs. Owens claims that her husband's Farm Bureau agent, Smith, did not explain the right to purchase UM coverage equal to the bodily injury liability limits under their policy. The Owenses' insurance policy carried $300,000 of bodily injury liability coverage for each person for each vehicle, and $50,000 of UM coverage for each person for each vehicle. As a result, Mrs. Owens asserts, she was denied available coverage of the amount of $1.5 Million ($300,000 stacked 5 times). The five policies owned by the Owens each included UM coverage of $50,000. Mrs. Owens asserts that, since her damages exceeded the available UM coverage of $250,000, she has suffered monetary loss. This claim was presented to, and rejected by, the jury.

---

[5]Miss. Code Ann. § 63-15-3 (Supp. 2003).

15

¶37.    Because the jury found in favor of Farm Bureau, we must review the record to determine whether the evidence, viewed in the light most favorable to Farm Bureau, supports the verdict.

¶38.    Mr. Owens's testimony concerning his knowledge of UM issues and his own coverage was less than positive.  For instance, when asked questions concerning whether UM coverage had been explained to him, he replied that he did not remember.  He admitted that he met with Farm Bureau's agent, Kelly Smith, every year to discuss his insurance needs, including the amount of coverage.  Mr. Owens admitted that he was presented a form which provided options including increasing his UM coverage to the liability limits of his policies.  He testified that he understood he could have raised his limits, but chose not to do so, and he provided testimony this indicated he understood the purpose of UM coverage.  He signed the form which stated, "I do not want my uninsured motorist limits increased.  Please leave them at 50/100/300.  I also waive all benefits above these amounts and all benefits of the umbrella policy."  Finally, Mr. Owens testified that he knew as early as 1989 that he could purchase UM coverage equal to his liability limits.  The bottom line of Mr. Owens's complaint against Farm Bureau regarding coverage is his belief that Smith should have recommended an increase in UM coverage.

¶39.    Farm Bureau's adjuster, Jimmy Sutherland, testified that Mr. Owens understood UM coverage.  In fact, Mrs. Owens's own expert, John Kornegay, testified that Mr. Owens understood the amount of his UM limits.

¶40.    Based upon this evidence, we cannot find the jury abused its discretion.  The jury verdict in favor of Farm Bureau was supported by sufficient evidence, and it must be upheld.

16

*Negligent claim handling*

¶41. Mrs. Owens further claims that Farm Bureau negligently, and in bad faith, handled her claim. Again, we begin by recognizing that this claim was presented to, and rejected by, the jury. Thus, our task is to determine whether, viewing the evidence in the light most favorable to Farm Bureau, the facts so overwhelmingly favor Mrs. Owens's claim that reasonable jurors could not have found in favor of Farm Bureau.

¶42. The precise claim, according to both Mr. and Mrs. Owens, is that Farm Bureau should have settled their claim sooner. Specifically, Mrs. Owens says that in May 1999, when Dr. Gober reported to Farm Bureau that Mrs. Owens's condition had "plateaued," Farm Bureau should have tendered the full available UM benefits under the policy. Instead, it began paying medical bills[6] from available UM coverage. Mrs. Owens argues that Farm Bureau was not acting as a "good Samaritan" but rather was "paying medical bills with Appellant's own money and earning interest for itself from those funds being wrongfully withheld."

¶43. On the other hand, Farm Bureau directs us to the following testimony of Mr. Owens:

Q.   Okay. Mr. Owens, Jimmy Sutherland took over this claim right after you told Kelly Smith it looked like you all were going to need some help; right?

A.   That's correct.

Q.   And within just a matter of a few days, Jimmy Sutherland was in contact with you; correct?

A.   Yes sir. That's correct.

* * *

---

[6]The Farm Bureau policy's one-year time limit for payment of medical bills under its medical coverage expired around the same time Farm Bureau received Dr. Gober's report.

Q. And to this day, you don't think that Jimmy Sutherland or anybody at Farm Bureau had any malice or ill will toward either you or Mrs. Owens; do you?

A. They did not.

Q. And you don't think that either Jimmy Sutherland or anybody else at Farm Bureau had any motivation to do anything other than to try to help you and Mrs. Owens; right?

A. That's right.

\* \* \*

Q. And Jimmy Sutherland, on more than one occasion, said, "When you all get ready to sit down and settle your claim, let me know;" right?

A. I can't recall that I – it may have been said.

Q. If Jimmy says that he did that, you would not disagree with that; would you?

A. That's correct.

\* \* \*

Q. Okay. So you never told and Mrs. Owens never told Jimmy Sutherland "I'm ready to sit down and see if we can get the rest of this uninsured motorist money;" did you?

A. No.

¶44. Mr. Owens went on to testify that he was unaware that when Farm Bureau tendered a check for the balance of UM benefits ($232,888.23), Mrs. Owens's attorney returned the check to Farm Bureau with a letter of rebuke, stating that he was "stunned" to receive the check, and that "I told you on August 28, 2000 that my client was not ready to receive those funds." Upon learning of the letter (at trial on the witness stand), Mr. Owens agreed that the attorney was speaking for him and Mrs. Owens.

18

¶45. Mrs. Owens provided similar testimony, stating that soon after she initiated her claim, Farm Bureau contacted her and explained her available coverage. She also agreed that she thought Sutherland always had her best interest at heart.

¶46. Additionally, Mrs. Owens's expert, John Kornegay, testified that he was not implying in any way that Farm Bureau handled Owens's claim in an inappropriate way.

¶47. This evidence, though conflicting with evidence presented by Mrs. Owens, is sufficient to support a jury verdict in favor of Farm Bureau.

### III. Bias, passion and prejudice.

¶48. Finally, Mrs. Owens asserts that she is entitled to a new trial because this verdict was the result of bias, passion and prejudice. Mrs. Owens asserts that Farm Bureau's attorney made personal attacks on her and her husband at the trial. She further states that the attorney questioned them about irrelevant and immaterial aspects of their lives, and made repeated references to their economic status in an attempt to prejudice the jury.

¶49. We have reviewed the entire transcript, and we find that, at times during the trial, both Farm Bureau's counsel and counsel for Mrs. Owens were verbally warned or reprimanded by the trial court for inappropriate remarks to the court and/or a witness. At times, hostile attitudes were exhibited on the part of attorneys and witnesses. Through the questioning of jurors in voir dire, defense counsel was able to make the jury aware that the Owenses were members of a country club, traveled to Europe and other destinations, and had supported Republican politicians. Although a carefully crafted motion in limine could have resulted in

19

the information coming before the jury in a more benign manner, we find the questions were reasonably calculated to learn information about jurors, and possible contacts, affiliations and beliefs which might bear on the decision to exercise peremptory strikes of jurors. We also find that the remarks and information complained of, taken individually or as a whole, do not justify a new trial.

## CONCLUSION

¶50. For these reasons, we affirm the circuit court's judgment.

¶51. **AFFIRMED**.

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**