RUSSELL, J.,
for the Court:
¶ 1. Charlie Honeycutt[1] appeals the circuit court’s order granting summary judgment and a final judgment of dismissal to all defendants. Honeycutt argues that the actions of Mississippi State Trooper Tommy Coleman (Trooper Coleman) were not subject to the requirements of the Mississippi Tort Claims Act (MTCA); that the cancellation notice provided by Atlanta Casualty Company (Atlanta Casualty) was ineffective; and that the insurance company through its agent had a duty to obtain a knowing and intelligent waiver of the uninsured-motorist coverage. The circuit court found there was no genuine issue of material fact, reasoning that Trooper Coleman was acting within the course and scope of his employment at the time of the accident and was, therefore, subject to the MTCA; that the Atlanta Casualty cancellation notice was effective; and that the insurance company, through its agent, had no legal duty to explain to the Honeycutts their right to purchase uninsured-motorist coverage. We find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On May 15, 1994, a motor-vehicle accident occurred involving Trooper Coleman, Honeycutt, and Matthew Blaxton. At the time of the accident, Blaxton was driving the vehicle, and Honeycutt was the passenger. The accident took place at approximately 12:38 a.m. at the intersection of Highway 45 and Waverly Road in Columbus, Lowndes County, Mississippi, when Blaxton’s vehicle turned left at a flashing yellow light in front of Trooper Coleman. Trooper Coleman struck Blax-ton’s vehicle on the right rear side. Trooper Coleman was driving his patrol car, returning home from a road block detail in Lowndes County when the accident occurred. According to Trooper Coleman, he was still on patrol duty when the accident occurred.
¶ 3. On September 12, 1993, Barbara Honeycutt (Barbara) had applied for motor-vehicle insurance and was issued policy number 03010110 from Atlanta Casualty. The policy was effective from September 15, 1993, to March 15, 1994. Barbara signed a rejection of uninsured-motorist coverage for policy number 03010110. On February 10,1994, Atlanta Casualty issued a renewal certificate with an effective date of March 15, 1994, and an expiration date of September 15, 1994. On March 21, 1994, Atlanta Casualty sent a cancellation notice of the policy for non-payment of the premium effective March 31, 1994. On March 11, 1994, Sam Honeycutt (Sam) made application to American Premier Insurance Company (American Premier) for motor-vehicle insurance. The application contained a signed rejection of uninsured-motorist coverage by Sam. According to Sam and Barbara, the uninsured-motorist coverage rejections they signed were not explained by the insurance agent.
¶ 4. On April 16, 2001, Honeycutt filed a complaint against the defendants. On March 16, 2005, the court entered an order granting summary judgment in favor of Trooper Coleman and dismissed him as a party defendant.[2] The court found Troop *410 er Coleman was acting within the course and scope of his employment at the time of the accident; therefore, the suit was barred by the one-year statute of limitations set forth in Mississippi Code Annotated Section 11-46-11(3) (Rev. 2002). On August 5, 2010, the court entered an order granting summary judgment in favor of defendants Atlanta Casualty Companies, Atlanta Casualty Company, and American Premier Insurance Company, followed by entry of a final judgment of dismissal with prejudice on August 27, 2010.
¶ 5. On September 8, 2010, Honeycutt appealed the judgment of dismissal entered on March 16, 2005, as to all claims against Trooper Coleman, and the order sustaining the motion for summary judgment and final judgment of dismissal with prejudice as to Atlanta Casualty Companies, Atlanta Casualty Company, and American Premier Insurance Company.
DISCUSSION
¶ 6. This Court employs a de novo standard in reviewing a trial court’s ruling on a motion for summary judgment. Green v. Allendale Planting Co., 954 So.2d 1032, 1037 (¶ 8) (Miss.2007). Such review entails an examination of all the evidentiary matters before us, including admissions in pleadings, answers to interrogatories, depositions, and affidavits. Id. The evidence must be viewed in the light most favorable to the non-movant. Id. The movant bears the burden of showing that no genuine issue of material fact exists. Id. The existence of a genuine issue of material fact will preclude summary judgment. Massey v. Tingle, 867 So.2d 235, 238 (¶ 6) (Miss.2004). The non-moving party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there are genuine issues for trial. Id. The “[non-moving] party’s claim must be supported by more than a mere scintilla of colorable evidence; it must be evidence upon which a fair-minded jury could return a favorable verdict.” Wilbourn v. Stennett, 687 So.2d 1205, 1214 (Miss.1996).
I. Effectiveness of the Ten-Day Cancellation Notice Requirement Found in Mississippi Code Annotated section 83-11-5 (Rev. 2011)
¶ 7. Honeycutt contends that the circuit court erred when it granted summary judgment in favor of Atlanta Casualty because the proper procedure was not followed by Atlanta Casualty to effectuate the cancellation of policy number 03010110. In particular, Honeycutt argues that a legal issue remains as to whether Atlanta Casualty Company effectively cancelled the insurance policy by mailing notice to the Honeycutt’s residence. Section 83-11-5 of the Mississippi Code Annotated states:
No notice of cancellation of a policy to which [Mississippi Code Annotated] [s]ection 83-11-3 applies shall be effective unless mailed or delivered by the insurer to the named insured and to any named creditor loss payee at least thirty (30) days prior to the effective date of cancellation; provided, however, that where cancellation is for nonpayment of premium at least ten (10) days’ notice of cancellation accompanied by the reason therefor shall be given. Unless the reason accompanies or is included in the notice of cancellation, the notice of cancellation shall state or be accompanied by a statement that upon written request of the named insured, mailed or delivered to the insurer not less than fifteen (15) days prior to the effective date of cancellation, the insurer *411 will specify the reason for such cancellation.
(Emphasis added).
¶ 8. On March 21,1994, Atlanta Casualty mailed Honeycutt notice of cancellation of his insurance policy number 03010110, effective March 31,1994, due to nonpayment of the premium. Honeycutt argues that this method of cancellation was ineffective because it did not give the requisite ten-day notice. This argument fails for two reasons. First, the certified mailing satisfied the notice requirement. Section 83-11-9 of the Mississippi Code Annotated (Rev. 2011) provides that proof of mailing of notice of cancellation, or of intention not to renew, or of reasons for cancellation to the named insured by a certificate of mailing, at the address shown in the policy, shall be sufficient proof of notice. Atlanta Casualty mailed the notice of cancellation to Barbara Honeycutt at 238 Fondren Drive, Columbus, MS 39702. No one disputes that this was the Honeycutt residence. Thus, the Atlanta Casualty met the requirements set out in the statute.
¶ 9. Honeycutt further argues that “the timeliness of the notice is to be determined by the date the insured is in receipt of the notice rather than the date of its mailing.” Black v. Fid. Guar. Ins. Underwriters Inc., 582 F.2d 984 (5th Cir.1978). However, in Branch, the court concluded that “when a certificate of mailing relative to the notice of cancellation is produced[,] and it contains the address shown on the policy, it is sufficient notice of cancellation.” Scotty Branch v. State Farm Fire & Cas. Co., 759 So.2d 430, 433 (¶ 8) (Miss.2000). In this case, the record contains a copy of the certificate of mailing which contained the admittedly correct address, which was listed in the policy of insurance; therefore, this established sufficient proof of notice of cancellation. Furthermore, Honeycutt’s argument still fails because, even if we considered the date of receipt rather than mailing as the effective date, the effective cancellation date would still be well before May 15,1994 — the day of the accident. Moreover, Honeycutt had obtained insurance coverage from American Premier before Atlanta Casualty issued the notice of cancellation. Thus, this issue is without merit.
II. Insurance Agent’s Duty to Explain Uninsured-Motorist Coverage
¶ 10. The Atlanta Casualty policy applications signed by Sam and Barbara provided the following uninsured-motorist coverage selection or rejection provision:
State law requires that no automobile liability insurance policy be issued or delivered unless it contains an endorsement or provisions undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury, death or property damage from the owner or operator of an uninsured motor vehicle and permits any insured named in the policy to select or reject uninsured motorist coverage for this policy and any renewal hereof. I acknowledge and agree that I have been given the option to purchase uninsured motorist coverage within limits no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility law and up to an amount not to exceed that provided in the policy of bodily injury liability insurance or to reject the coverage entirely. After having uninsured motorist coverage offered and explained, I have voluntarily and intentionally exercised this option, as indicated below and as shown on the other side of this application.
(Emphasis added).
¶ 11. On September 12, 1993, Barbara applied for motor-vehicle insurance with *412 Atlanta Casualty. At the time of application, Barbara signed a rejection of the uninsured-motorist coverage. She obtained policy number 03010110 effective for the six-month period from September 15, 1993, through March 15, 1994. The policy provided liability coverage but did not provide uninsured-motorist coverage or medical-payment coverage.
¶ 12. On February 10, 1994, Atlanta Casualty issued a renewal certificate for policy number 03010110, effective March 15, 1994, through September 15, 1994. The Honeycutts did not remit a premium payment to continue coverage, and on March 21, 1994, Atlanta Casualty mailed a notice of cancellation of the renewal certifí-cate to Barbara for non-payment of the premium.
¶ 13. On March 11, 1994, Sam applied for motor-vehicle insurance with American Premier and obtained policy number 05088064 for the time period of March 15, 1994, through September 15, 1994. Sam also signed a rejection of the uninsured-motorist coverage.
¶ 14. Sam argues that while he signed the rejection of the uninsured-motorist coverage, he did not do so knowingly. When questioned about his knowledge, Sam testified:
All I would do is when I call them and tell them to put insurance on a vehicle, I would go by there and flip pages, and I’d sign lines. I never read anything in any kind of fine print whatever was on that policy because I trusted him as my agent to take care of it. He [ (insurance agent Larry Phebus) ] never told me I ever had — didn’t have uninsured motorist coverage on any of my policies. All I ever done is told him I wanted full coverage.
Barbara similarly testified that “they just tell you you don’t have to bother reading it, just initial it or sign it.”
¶ 15. In spite of their testimony that they did not know what they were signing, both Sam and Barbara knowingly rejected uninsured-motorist coverage in writing. Moreover, they both signed and acknowledged that the uninsured-motorist coverage was offered and explained, and that they voluntarily and intentionally signed the waiver. While Barbara has a high school education and testified that Sam handles all of the insurance, Sam testified that he worked as a warehouse manager for twenty years and that upon retirement in 1999, he opened his own janitorial business. When questioned about the insurance documents, Sam testified:
Q: You can read and write?
A: Oh, yes, sir.
Q: And what you read, you can understand?
A: Yes, sir.
Q: And when you — would he [Larry Phebus] give you copies of your policies and documents?
A: Yes, sir. They made them.
Q: And did you read those?
A: No, sir.
Q: Why not?
A: I just didn’t, because I trusted that he put on that vehicle whatever I had whatever was supposed to be on it. I just didn’t go through it and read it.
Q: So if you would have — if he would have sent you document after document through the years, you would not have read them?
A: No, sir.
Q: When you do business with your janitorial company, do you enter into written contracts with people to provide—
A: Yes, sir. I read them, I type them out, and they sign them.
*413 Q: And do you go through them line by line and explain to them what the contract says, or do you give it to them to read and decide?
A: I give it to them.
Q: And in the insurance business, do you know that the written policy is the contract between you and the insurance company and whatever coverages you have are spelled out in the contract?
A: Yes, sir.
Q: And you’re familiar with contracts, and you know if you have a contract and you’re a party to it, then you’re bound by it?
A: Yes, sir.
¶ 16. In Mississippi, insurance polices are contracts, and as such, they are to be enforced according to their provisions. Corban v. United States Auto. Ass’n, 20 So.3d 601, 609 (¶ 19) (Miss.2009). It is well settled under Mississippi law that a contracting party is under a legal obligation to read a contract before signing it. Booker v. Am. Gen. Life & Accident Ins. Co., 257 F.Supp.2d 850, 862 (¶ 9) (Miss.2003) (quoting Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., 584 So.2d 1254, 1257 (Miss.1991)). Moreover, knowledge of the contents of a contract is imputed to a contracting party even if that party did not read the contract before signing it. Id. (quoting Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss.1987)).
¶ 17. Here, the insurance agreement clearly provides an option for uninsured-motorist coverage. While both Sam and Barbara testified that they did not read the policy, “knowledge of its contents would be imputed to them as a matter of law.” Cherry, 501 So.2d at 419 (quoting Atlas Roofing Mfg. Co. v. Robinson & Julienne, Inc. 279 So.2d 625, 629 (Miss.1973)). Therefore, they are bound by the terms of the contract.
¶ 18. Moreover, Larry Phebus did not have a duty to explain the terms to them. Our supreme court has stated:
Although we question the seemingly absolute requirement of explanation by the insurance agent, we ... hold that the statutorily required waiver of [uninsured-motorist] coverage may be obtained only from a fully-informed insured. That is to say, the waiver must be knowing and intelligent. The simple principle announced here is that no statutorily-required waiver of [uninsured-motorist] benefits is effective unless the waiver was obtained from an insured who was reasonably knowledgeable and informed of the costs and benefits of such [uninsured-motorist] coverage prior to signing the waiver. To this extent, we reaffirm the holding in Berry.[3] However, we reject and overrule the implication in Berry that an insurance agent has the absolute, court-created duty to explain an insured’s right to purchase additional [uninsured-motorist] coverage, over and above the amount of coverage required by statute.
Owens v. Miss. Farm Bureau Cas. Ins. Co., 910 So.2d 1065, 1074 (¶¶ 34-35) (Miss.2005). While Owens does not involve the exact set of circumstances as the present case, this Court will not now impose a duty upon insurance agents to explain any and all contractual provisions. Both Sam and Barbara voluntarily rejected uninsured-motorist coverage. Sam and Barbara are educated and can read and write. There is nothing unclear or ambiguous about the language found in the uninsured-motorist provision of the agreement. Sam even testified that he drafts contracts for his *414 janitorial business. In fact, he testified that he provides the contract to potential clients without going over the contract with them. Instead, he lets them read it.
¶ 19. It is undisputed that with or without notice, the Honeycutts purchased coverage that terminated on March, 31, 1994. Even if this Court found the cancellation ineffective and that the policy was extended beyond March 31, 1994, it would still provide for the same coverage already on the policy. Barbara signed a rejection of the uninsured-motorist coverage. Any extension of the same policy would exclude uninsured-motorist coverage, leaving Ho-neycutt without recourse. Sam and Barbara cannot now argue that they thought they had, should have had, or expected to have uninsured-motorist coverage, when they repeatedly rejected it and never paid for it. This issue is without merit.
III. Trooper Coleman’s Status and Applicability of the MTCA
¶20. The MTCA provides the exclusive civil remedy against a governmental entity and its employees for acts and omissions giving rise to a suit. City of Jackson v. Annie Mae Sutton, 797 So.2d 977, 980 (¶¶ 9-10) (Miss.2001). Any claim filed against a governmental entity and its employees must be brought under this statutory scheme. Id. Statutes within the Act provide that the MTCA is the exclusive route for filing suit against a governmental entity and its employees. Id. (citations omitted). A governmental entity and its employees acting within the course and scope of their employment shall be free of liability for a claim based upon any of the acts or omissions enumerated therein. Miss.Code Ann. § 11-46-9 (Supp.2011).
¶21. Honeycutt argues that Trooper Coleman is liable for damages even if the Court finds that the alleged criminal offense constitutes a traffic violation, because he was not acting within the course and scope of his employment at the time of the accident. Trooper Coleman provided uncontroverted testimony that on the date of the accident he was working a 4 p.m. until 1 a.m. roadblock detail in East Columbus and acting within the scope of his employment. They ended the roadblock early because Trooper Coleman did not live in Columbus and needed time to drive home.
¶22. Trooper Coleman provided the following testimony concerning his work status on the day of the accident:
But now when I left this [roadblock] detail I’m still on duty. You’re on duty all the time until you go home and go 10-7 out of that car, you are on duty. You may have a time that says — Like that particular day, I was scheduled from four o’clock to one o’clock in the morning. Even though this accident happened within that time period, I’m still on duty until I get home and say I’m 10-7 out of that car. If anything happened between, say Columbus or whatever, I’m still on duty. I’m required to work it.
James Humphries, Trooper Coleman’s supervisor, who has been with the Highway Patrol since 1981, provided the following testimony regarding Trooper Coleman:
He’s a state trooper and just because he’s fifty (50) miles from home, forty (40) miles, doesn’t mean that he cuts the radar off and quits looking for drunks. He’s going to write tickets and work his way home. That’s just part of the job. It’s not like we shut down and head to the house. It doesn’t work that way. It doesn’t work that way because one o’clock might be the end of the shift but that is not the end of your work.
Our supreme court found that an officer returning from traffic court when the accident occurred was acting within the course *415 and scope of his employment as a patrol officer after the director for the City of Biloxi Department of Police similarly testified:
Pursuant to City of Biloxi policy, patrol officers are on duty, subject to call, and subject to the control, direction, and supervision of the City of Biloxi Department of Police while operating patrol vehicles provided by the City of Biloxi Department of Police, regardless of the officers’ immediate destination.
Leslie v. City of Biloxi, 758 So.2d 430, 433 (¶ 9) (Miss.2000).
¶23. It is undisputed that Trooper Coleman was headed home and driving his patrol car at the time of the accident. It is also clear from the testimony that he was still on duty at the time of the accident. The evidence can lead to no other conclusion than Trooper Coleman was acting within the course and scope of his employment with the Mississippi Highway Patrol at the time the accident occurred. Accordingly, Honeycutt’s claims against Trooper Coleman are barred by the one-year statute of limitations set forth in Mississippi Code Annotated Section 11-46-11(3). This issue is without merit.
¶ 24. For the foregoing reasons, we affirm the judgment of the circuit court.
¶ 25. THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J, IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. Charlie Honeycutt was a fifteen-year-old minor at the time of the accident.

. It appears that the court treated Trooper Coleman's motion to dismiss as one for summary judgment. This is proper under Rule nib), which provides: "[I]f, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be *410 treated as one for summary judgment and disposed of as provided in Rule 56[.]”

. Aetna Cas. & Sur. Co. v. Berry, 669 So.2d 56 (Miss.1996).